# **EXHIBIT 1**

Erik Christiansen, USB #7372
Alan Mouritsen, USB #13558
Brian M. Rothschild, USB #15316
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
echristiansen@parsonsbehle.com
amouritsen@parsonsbehle.com
brothschild@parsonsbehle.com

*Co-Counsel for Walker Edison Furniture
Company, LLC*

Michael Farhang (admitted pro hac vice)
Michael Neumeister (admitted pro hac vice)
Jeffrey C. Krause (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 229-7000
MFarhang@gibsondunn.com
mneumeister@gibsondunn.com
jkrause@gibsondunn.com

Adam J. Jantzi (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
ajantzi@gibsondunn.com

---

## IN THE THIRD JUDICIAL DISTRICT COURT

## FOR THE COUNTY OF SALT LAKE, STATE OF UTAH

| | |
|---|---|
| WALKER EDISON FURNITURE COMPANY, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>BRAD BONHAM; MB & BB HOLDINGS, LLC; MATT DAVIS; WALKER EDISON HOLDING COMPANY, LLC; PROSPECT HILL GROWTH PARTNERS, L.P.; JWC-WE HOLDCO, LLC; JWC-WE HOLDINGS, L.P.; PROSPECT HILL GROWTH FUND II, L.P.; PROSPECT HILL GROWTH FUND II CO-INVEST, L.P.; PHIL DAMIANO; KEN MURPHY; ADAM SUTTIN; KYLE CASELLA; DAVID FIORENTINO; AND DOES 1-100,<br><br>    Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Civil No. 230902160<br><br><br>Judge Robert Faust<br><br>Discovery Tier 3 |

Plaintiff Walker Edison Furniture Company LLC ("**Walker Edison**" or the "**Company**"), for its Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.    This action seeks to recover approximately $210 million of cash that Defendants wrongfully took from Walker Edison, a Utah-based global furniture company.  In March 2021, Defendants, the former controlling owners and their affiliates, abused their positions of control to cause the Company to borrow more than $300 million in order to fund an improper $210 million dividend that went straight into Defendants' pockets.  This illegitimate transfer occurred at the worst possible time for Walker Edison, amid spiraling costs, decreasing cash flow, inventory problems, and revenue challenges of which Defendants were fully aware, rendering the Company effectively insolvent, short of cash, and unable to pay its debts as they became due.

2.    Defendants—who were not just the controlling owners but also comprised essentially the entirety of Walker Edison's senior management and governing board—did so with full knowledge that the dividend was improper because of the Company's effective insolvency. They knew that the Company was facing a liquidity crisis.  They knew the Company's financial statements and projections were inaccurate, unreasonable, and inflated because they did not account for massive increases in expenses that were plaguing the Company.  They knew that no fair or reasonable valuation of the Company justified such a large dividend.  And they knew that removing approximately $210 million from the Company and taking on $300 million in new debt just as costs were skyrocketing would exacerbate the Company's liquidity problems and put its survival at risk.

2

3.     Indeed, when the loan to Walker Edison closed on March 31, 2021, and Defendants paid themselves their massive $210 million dividend, things were so bad at Walker Edison that the Defendants had already decided to start short-paying the Company's suppliers and to implement immediate and drastic hiring cuts.  The Company's internal cash flow projections were showing that it would run out of credit availability within weeks.  These were not conditions that justified Defendants taking $210 million out of the Company.  On the contrary, Defendants knew at the time of the dividend that (i) the Company had cash flow problems and was unable to pay its suppliers on time, (ii) the historical financial statements overstated profitability by failing to properly account for freight expenses that were rapidly increasing, (iii) the Company would be unable to meet the financial covenants required under the new financing, and (iv) the financial projections used to justify the dividend were materially inflated and failed to account for the massive increase in expenses the Company had experienced during the preceding months, which were not expected to decrease in the foreseeable future.  As the Company's own President complained several weeks after the Defendants took their dividend, "we were saying from the very beginning that the forecast for this year was way too high, and no one listened."

4.     Defendants paid themselves anyway by taking on additional debt, which further exacerbated the Company's insufficient liquidity.  And when the Company's cash shortages compounded soon afterward, Defendants unsuccessfully sought to remedy the consequences of their wrongful conduct through desperate efforts to obtain additional financing and additional equity investments.  These measures were not enough.  In the span of only one year—the very year Defendants decided to take approximately $210 million in badly needed cash out of the Company that could have been used to weather difficult times—the Company burned through over

$100 million of cash to address the same spiraling costs and inventory challenges that were evident to the Defendants prior to the dividend payment.  Within just months of receiving their dividend, Defendants described the Company's financial position with statements like "the house is on fire," and "the precarious situation we are in," as they discussed firing all employees who were not "mission critical," and questioned whether the Company would have "the cash and profitability to actually survive this."  Two years after the $210 million dividend, the Company's performance still has not recovered.

5.      By early 2023, unable to reverse the effects of their misconduct, Defendants abandoned the Company in a change-of-control transaction and exited the disaster they had created.  As a result, Walker Edison's lenders assumed ownership and control of the Company and provided approximately $50 million of additional capital to support operations.  Meanwhile, Defendants, as former owners, have retained the benefits of their massive and improper payout. As a result of the facts described herein, Walker Edison brings the instant suit to right this egregious wrong and to recoup the Company's capital, which should have remained with the Company and should never have been paid out to Defendants as a dividend.

## JURISDICTION, VENUE, AND DISCOVERY TIER

6.      Jurisdiction is proper under Utah Code § 78A-5-102(1).

7.      Venue is proper in this Court under Utah Code § 78B-3-307(1)(a) because this is the county in which the causes of action arose, and Utah Code § 78B-3-307(1)(b) because this is the county in which one or more Defendants reside at the commencement of this action.

8.      Defendants Brad Bonham and Matt Davis are residents of Utah and therefore subject to the general personal jurisdiction of this Court.

4

9.      Defendant MB & BB Holdings, LLC is subject to the general personal jurisdiction of this Court because it is a Utah limited liability company with its principal place of business in Utah.

10.      Collectively, Brad Bonham, MB & BB Holdings, LLC, and Matt Davis are referred to as the "**Founder Defendants**."

11.      Defendants Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., and Prospect Hill Growth Fund II Co-Invest, L.P. (collectively, the "**PHGP Defendants**" and with the Founder Defendants, the "**Defendants**") are subject to personal jurisdiction in this Court pursuant to Utah Code § 78B-3-201 et seq.

12.      This case involves claims for more than $300,000, and therefore falls within Tier 3 of Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## THE PARTIES

### I.      PLAINTIFF WALKER EDISON FURNITURE COMPANY LLC

13.      Walker Edison is a Utah limited liability company, with its principal place of business at 1553 West 9000 South, West Jordan, Utah.

### II.      DEFENDANTS

14.      Brad Edison Bonham is the former Chief Executive Officer and co-owner of Walker Edison, as well as a member of the board of directors that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides in Salt Lake City, Utah.

5

15.     MB & BB Holdings, LLC is a Utah limited liability company, with its principal place of business at 4350 West 2100 South, Suite A, Salt Lake City, Utah.  On information and belief, it is owned and managed by Defendant Brad Bonham.

16.     Matthew Brown Davis is the former Chief Operating Officer and co-owner of Walker Edison, as well as a member of the board of directors that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides at 6141 W. Cherry Springs Ct., Salt Lake City, Utah.

17.     Walker Edison Holding Company, LLC ("**Walker Edison Holding**") is a Delaware limited liability company.  On information and belief, its principal place of business is in West Jordan, Utah.

18.     Prospect Hill Growth Partners, L.P. ("**Prospect Hill**") is a Delaware limited partnership, with its principal place of business at 500 Totten Pond Road, 6th Floor, Waltham, Massachusetts.

19.     JWC-WE Holdco, LLC is a Delaware limited liability company.  On information and belief, its principal place of business is in Waltham, Massachusetts.

20.     JWC-WE Holdings, L.P. is a Delaware limited partnership.  On information and belief, its principal place of business is in Waltham, Massachusetts.

21.     Prospect Hill Growth Fund II, L.P. is a Delaware limited partnership.  On information and belief, its principal place of business is in Waltham, Massachusetts.

22.     Prospect Hill Growth Fund II Co-Invest, L.P. is a Delaware limited partnership.  On information and belief, its principal place of business is in Waltham, Massachusetts.

23.　　Phil Damiano is an Operating Partner at Prospect Hill and was the non-executive chairman of the board of directors that controlled Walker Edison at all times relevant to this Complaint.　On information and belief, he resides in or around Waltham, Massachusetts.

24.　　Ken Murphy is CEO of a Prospect Hill portfolio company and a member of the board of directors that controlled Walker Edison at all times relevant to this Complaint.　On information and belief, he resides in or around Philadelphia, Pennsylvania.

25.　　Adam Suttin is Managing Partner of Prospect Hill and was a member of the board of directors that controlled Walker Edison at all times relevant to this Complaint.　On information and belief, he resides in or around Newton, Massachusetts.

26.　　Kyle Casella is a Principal at Prospect Hill and was a member of the board of directors that controlled Walker Edison at all times relevant to this Complaint.　On information and belief, he resides in or around Boston, Massachusetts.

27.　　David Fiorentino is a former Partner at Prospect Hill and was a member of the board of directors that controlled Walker Edison at all times relevant to this Complaint.　On information and belief, he resides in or around Winchester, Massachusetts.

28.　　Does 1 through 100 are individuals who received unlawful distributions or transfers or participated in some manner in the events described in this Complaint, and therefore proximately caused or are otherwise liable for the injuries and damages that this Complaint describes.　The true names and capacities of Does 1 through 100 are not now known to Plaintiff, who therefore sues these Defendants by fictitious names.　Plaintiff will amend this Complaint to show their true names and capacities as it learns this information.

# FACTUAL ALLEGATIONS

## III.    WALKER EDISON'S BUSINESS AND ORGANIZATION.

### A.    Operations.

29.    Walker Edison is a supplier of affordable, ready-to-assemble home furnishing products through e-commerce channels to consumers worldwide.  Defendants Brad Bonham and Matthew Davis founded the Company in or around 2006.  Defendant Bonham served as Walker Edison's Chief Executive Officer until June 2022, and served on the board of directors that controlled Walker Edison until the Company changed owners in 2023.  Defendant Davis served as Walker Edison's Chief Operating Officer until April 2022, and continued to serve on the board of directors that controlled Walker Edison until the Company changed owners in 2023.  In the years leading up to 2020, Walker Edison was a profitable company with an impressive track record.

30.    Unlike traditional brick-and-mortar furniture stores, at all relevant times Walker Edison operated exclusively through e-commerce channels, in which orders are placed on platforms such as Wayfair and Amazon.  The vast majority of its products are shipped from Walker Edison's manufacturing suppliers in Asia and South America to the Company's own distribution centers or to the distribution centers of its e-commerce channel partners.  From these distribution centers, orders are then drop-shipped directly to consumers.

31.    In order to meet customer demands for prompt delivery, Walker Edison must carefully manage its network of distribution centers and maintain a sophisticated inventory management system and a dedicated logistics team.  E-commerce platforms therefore monitor the performance of suppliers like Walker Edison to ensure prompt and satisfactory deliveries to

consumers.  If Walker Edison fails to meet expectations, its listings on e-commerce platforms will drop lower in the platform's search results, which reduces the visibility of Walker Edison's products and negatively impacts sales.

32.      Walker Edison operates in a highly competitive industry with relatively few e-commerce platforms through which to sell its products to consumers.  As of January 2021, approximately 86% of the Company's sales were generated through relationships with just four e-commerce platforms—Wayfair, Amazon, Walmart, and Target.  Accordingly, Walker Edison must maintain good relationships with its e-commerce platform partners because disruptions on even one platform can have serious consequences for Walker Edison.

**B.      <u>Corporate Structure.</u>**

33.      Plaintiff Walker Edison is, and has been at all times relevant to this Complaint, fully owned by Walker Edison Intermediate, LLC ("**Walker Edison Intermediate**").  In turn, during the relevant period, Walker Edison Intermediate was fully owned by Defendant Walker Edison Holding.  On information and belief, at all relevant times, the board of directors for Walker Edison Holding (the "**Board**") controlled all material decisions of Walker Edison Intermediate and Walker Edison.  On information and belief, at all relevant times, the Board was controlled and dominated by Defendants Davis, Bonham, and Prospect Hill.  On information and belief, the Board did not have a single independent director, and was comprised solely of insiders.

**C.      <u>Prospect Hill and the Founder Defendants Owned and Controlled Walker Edison.</u>**

34.      Prior to September 2018, Walker Edison was jointly owned by the Founder Defendants and a California-based private equity and mezzanine debt provider.

35.     In or around September 2018, the PHGP Defendants, comprising a Massachusetts-based private equity firm and family of funds now known as Prospect Hill, but then known as J.W. Childs Associates, acquired for approximately $191 million a 55% majority share of the Company from the Founder Defendants and the California-based firm, with the Founder Defendants retaining a 45% ownership interest.

36.     Prospect Hill is a private equity investor that has invested over $2.8 billion in 37 portfolio companies.

37.     Following Prospect Hill's 2018 investment, Defendant Brad Bonham continued to serve as CEO, and Defendant Matt Davis continued to serve as COO.  Both Defendants Bonham and Davis also continued to serve on the Board.  Upon acquiring a majority share of the Company, Prospect Hill added its own Board members, including non-executive chairman Defendant Damiano (Operating Partner at Prospect Hill), Defendant Murphy (CEO of a Prospect Hill portfolio company), Defendant Suttin (Managing Partner of Prospect Hill), Defendant Casella (then-Vice President and now Principal at Prospect Hill), and Defendant Fiorentino (then-Partner at Prospect Hill).  On information and belief, there were no independent directors on the Board.

## IV.   DEFENDANTS FALSELY PORTRAYED WALKER EDISON'S FINANCIAL HEALTH TO ATTRACT FINANCING FOR A MASSIVE DIVIDEND.

### A.   Defendants Sought to Cash Out of the Business Following a Period of Explosive Growth.

38.     The Company experienced massive growth in the years leading up to and including portions of 2020 amid the COVID-19 pandemic.  During that period, e-commerce furniture sellers experienced significant sales growth as brick-and-mortar competitors shut their doors while consumer demand rose as people were forced to spend more time at home.  Industry-wide, the

share of all furniture sales conducted online grew from only 21% pre-COVID-19 to 71% of all furniture sales during the peak of the COVID-19 pandemic from March 19 to May 20, 2020.

39.     Walker Edison benefited from the significant and immediate growth in the online furniture industry.  From 2017 to 2020, Walker Edison saw EBITDA grow from $13 million to $84 million.  EBITDA stands for earnings before interest, taxes, depreciation, and amortization. It is one of the most widely used measures of a company's overall financial performance.  And while such growth peaked during the pandemic, online furniture sales overall remained above pre-pandemic levels even after brick-and-mortar competitors began to reopen.

40.     In at least as early as 2020, seeking to capitalize on this explosive growth, the existing shareholders—Defendants Bonham, Davis, and Prospect Hill—decided it was the right time to launch an effort to extract cash from the business.

41.     On information and belief, in order to finance their desired payout, Defendants considered a number of options to allow them to liquidate their ownership in the Company, including an acquisition by a Special Purpose Acquisition Company ("**SPAC**"), a large equity investment, or a debt financing.

42.     Ultimately, Defendants' efforts in late 2020 and early 2021 to explore various non-debt options proved unsuccessful, and they settled on a strategy to finance their payout through a dividend recapitalization, or "dividend recap."  This required the Company to incur $300 million of additional debt in order to fund an approximately $210 million dividend to themselves (the "**Dividend**").  Without the loan, Defendants could not have paid such a large dividend to themselves, and with the loan, the Company's debt load would increase tremendously.  Having failed to realize alternative strategies, Defendants began soliciting potential lenders on behalf of

the Company in or around March 2021.  On information and belief, the efforts to fund this dividend recap were led by Defendants Bonham, Davis, and representatives of Defendant Prospect Hill, including Defendants Fiorentino, Damiano, Casella, and others.

### B.   The Company Began to Experience Financial Distress Before Defendants Received the Dividend.

43.     In late 2020, while Defendants were strategizing ways to fund their payout, Walker Edison management discovered that overseas freight and shipping costs had been skyrocketing due to pandemic-related supply chain issues, and that the Company's accrual accounting method had been inappropriately understating freight costs.

44.     From March 2020 to March 2021, the cost of a single ocean freight container used to transport Walker Edison's products from its overseas manufacturers rose from approximately $2,600 to $7,300, an increase of approximately 180%, year over year.  By December 2021, the cost of a single container increased to approximately $8,800.

45.     Not later than October 2020, Defendants knew that freight and shipping expenses were rising rapidly and that their accounting methods were not accurately reflecting real-time increases.  On October 9, 2020, for example, the Company's Controller notified the CFO that in working on the month-end closing process for the Company's income statement, he had noticed an "area of significant concern" relating to an unusual increase in freight and shipping expenses that he could not explain, including a cost balance that had grown 57% since the previous month, and that was five times higher than the previous January.  The CFO reviewed the income statement figures and replied "my biggest concern is the shipping expenses.  Would really like to know what's going on there.  Seems like maybe the cost allocations for capitalizing freight are being understated potentially?"  In fact, the Company's accounting at the time was significantly

understating freight costs in violation of Generally Accepted Accounting Principles due to a failure to reconcile actual freight costs with capitalized prepaid costs.

46.     A few days later, Defendant Bonham spoke with the Company's CFO, who told him that the Company had seen an $800,000 increase in shipping charges from the prior month, "but no revenue offset of that expense which we would expect to see."  A month later, the CFO told Defendants Bonham and Davis that shipping charges continued to rise month-over-month and that the Company would miss budgeted EBITDA in part because "we are getting killed by FedEx peak season charges."

47.     Almost immediately, the Founder Defendants began discussing the precipitous increases in shipping and ocean freight expenses affecting the Company with the PHGP Defendants.  The Founder Defendants and PHGP Defendants were well aware of the risk to the Company's forecasted performance posed by freight and shipping price increases and the decreasing FedEx and UPS shipping capacity for the Company's products, which was resulting in significant delays and price increases hitting the Company's bottom line each month.  On October 12, 2020, Defendant Casella asked Defendants Bonham and Davis about the "big log jam expected in Q4" that could spiral "out of our control" and asked for a call to discuss "the potential impact of shipping on our ability to hit the forecast," which he said would receive "very heightened scrutiny" in light of Defendants' desire for a liquidity transaction.  Three days later, Defendant Fiorentino recounted that the PHGP Defendants had been told in a management presentation that ocean freight costs were "way up," and advised that "[a]t the least, we should calculate the hit we have taken vs. last year," noting that Defendant Davis would be following up with information on this point and on the issue of FedEx and UPS rates.

48.    Defendants were fully aware of the serious problem posed by rising freight and shipping charges (and the Company's improper understatement of freight charges in its financial statements) by not later than December 2020, and quickly realized that it could spook potential investors and therefore jeopardize their desired payout.  Accordingly, the Founder Defendants and PHGP Defendants discussed the need to suppress mention of these issues in Company promotional materials.  On December 2, 2020, Defendants Fiorentino, Casella, and Damiano were told that "[freight] rates are increasing all over the map due to capacity limitations."  Defendant Fiorentino then told Defendants Casella and Damiano that he had hoped the ocean freight market would improve but that "doesn't seem to be the case."  On December 8, 2020, a PHGP representative told the Founder Defendants that "[we] thought not ideal to call out ocean freight at this point as the market dynamics are still fluctuating and we might not want buyers scrutinizing this."  (Emphasis added).  Two weeks later, Defendant Fiorentino reinforced his concern about highlighting freight prices to buyers, saying "I don't think we want to open the ocean freight can of worms."  On information and belief, Defendants continued to investigate, monitor, and discuss the increased freight and shipping costs—and the Company's failure to properly account for freight costs—over the next two months, including during the Company's closing of its year-end financial statements in February 2021, when the Company again confirmed that there were, in fact, significant errors with the Company's freight accounting that had the effect of understating freight expenses and materially overstating gross profit and EBITDA.

49.    Defendants knew that the Company's financial statements—which understated costs and thereby overstated EBITDA and net income—did not reflect the Company's true financial position.  But Defendants chose not to rectify the accounting misstatements until *after*

the closing of the dividend recap transaction.  On information and belief, Defendants decided not to correct these misstatements because correcting the accounting information could impair the Founder Defendants' and PHGP Defendants' chances of achieving a large payday through a new equity investment or dividend recap transaction.

50.     Rising freight and shipping costs and delays were not the only problem that the Company was beginning to face.  The same supply chain disruptions that were causing increased freight and shipping costs were also causing a spike in Walker Edison's out-of-stock rates and on-time delivery rates, both of which directly impact Walker Edison's sales.  High out-of-stock rates lead to lost revenue because Walker Edison cannot sell what it does not have.  And both high out-of-stock rates and low on-time delivery rates negatively impact a seller's relationship with e-commerce platforms and can cause their listings to appear lower in the platform's search results.  By December 2020, shipping delays had become so pronounced that they caused one of Walker Edison's largest e-commerce platform customers to shut off the Company's sales on the platform entirely for much of the month of December, causing the loss of millions of dollars in revenue.  Referring to the negative impacts on the Company's performance caused by the shipping problems, Defendant Bonham told Defendant Davis and his management team, "I expect all of us to ask ourselves how did we [expletive] December this badly . . . if we don't take drastic action right now, we can kiss January goodbye as well."  In combination, these problems were also creating significant cash flow problems for the Company.

51.     Defendants knew that problems were mounting with their out-of-stock and on-time delivery rates, which would cause problems down the road prior to paying themselves the Dividend.  But as with freight expenses, Defendants relied on and reported financial information

that did not reflect the reality that the business was facing.  On information and belief, the misstated out-of-stock rates and on-time shipment rates, of which Defendants were aware, negatively affected the Company's preferential page placement with key e-commerce partners and contributed to a significant decline in sales in at least May and June, 2021.

52.    All of these issues, among others, meant that the Defendants knew the Company, prior to the issuance of the Dividend, was facing disruption to its business and financial projections that would impact the Company's ability to pay debts as they came due.  As the months played out, and as a result of these known circumstances, the Company did in fact begin hemorrhaging cash to such an extent that it faced challenges in funding ongoing operations.

### C.    Defendants Portrayed a Financially Healthy Company When Walker Edison Was Actually in Crisis.

53.    To attract potential lenders to loan the Company $300 million in new money, and to justify taking the approximately $210 million Dividend out of the company despite the imminent cash flow problems that Defendants knew were on the horizon, Defendants relied upon and disclosed to lenders financial data through February 2021 that they knew was not reasonable or realistic under the circumstances.

54.    More specifically, the projections that Defendants relied on and distributed to potential lenders in March 2021 contemplated that Walker Edison would continue its earlier strong performance despite known and knowable facts to the contrary.  The faulty projections included the below.

- Cost of Goods Sold and Cost of Shipping: Defendants projected the same Cost of Goods Sold as a percentage of net sales for 2021 through 2025 and the same Cost of Shipping as a percentage of net sales for 2021 as they had in earlier projections as of November 2020,

failing to account for the known dramatic increases in both freight expense (captured in Cost of Goods Sold) and cost of shipping since that time.

- Gross profit:  Defendants projected gross profit of $197.2 million in 2021, which was higher than the Company's last-twelve-month ("**LTM**") gross profit of $146.5 million.

- Reported EBITDA:  Defendants projected reported EBITDA of $104.4 million for 2021.

- Adjusted EBITDA:  Defendants projected adjusted EBITDA of $111.6 million for 2021. Adjusted EBITDA is a measure of EBITDA that removes what the Company considers to be nonrecurring or one-time items.

55.    In reality, because the Company was experiencing diminished liquidity to fund operations, revenue challenges, and increased costs that were not reflected in the Company's historical financial statements or go-forward projections, these projections were intentionally misleading.

56.    Meanwhile, to justify causing the Company to borrow $300 million to fund the Dividend, Defendants represented in forecasts that the Company's explosive growth—including the "bump" in sales that the Company and industry experienced during the first year of the COVID-19 pandemic—would continue without disruption.  In other words, the Defendants premised their efforts to finance a massive dividend for their exclusive benefit on (a) unwarranted assumptions that the Company would continue the substantial growth it experienced as a result of the COVID-19 pandemic; and (b) bad data that they knew misleadingly omitted the impact of increased freight, shipping, and other costs, which impacts would ultimately also contribute to slumping sales.

57.    The financial statements and projections that Defendants shared with potential equity investors and lenders portrayed a successful and growing company.  The reality was that

Defendants knew by no later than March 2021 that the Company was experiencing decreased profits and sales, increased expenses, and a substantial liquidity shortage. Undeterred in their mission to extract the Dividend from the Company, Defendants knowingly provided materially inaccurate information to lenders and relied on that information to justify the Dividend.

58.    In contrast to the rosy portrayal of the Company that Defendants made to lenders, Defendants had begun internally to express decidedly pessimistic views of the Company's financial position, none of which were disclosed to potential investors or lenders. On March 11, 2021, for example—approximately three weeks before closing the new $300 million loan and causing the Dividend to be issued—Defendant Bonham told Defendant Davis and other Walker Edison employees that they "just had a meeting with the P[rospect] H[ill] guys," where the Company's CFO, "shared an erosion happening in our profit profile due to inbound freight and outbound increased FedEx charges." (Emphasis added). On the same day, the CFO warned Defendants Bonham and Davis that "I know we 'think' we will see relief in May or June on the ocean freight, but I wouldn't count on it and I'm really worried about the raw materials market." There was no disagreement from Defendant Bonham, who, in another email, expressly stated that he did not "see ocean freight or fedex costs reverting."

59.    Tempers appeared to flare at the Company as Defendants tried to deal with the Company's financial woes. On March 11, 2021, the Company's Controller put it bluntly: "cash is short right now." On the same day, the Defendants had attended a meeting to discuss the Company's "recent underperformance." The Company's President then expressed regrets that "the meeting did not go well and could have been better managed," alluding to Defendants' frustration with the management team that had brought them more bad news without providing

any reassurance.  The Company's President then provided the Founder Defendants and PHGP Defendants a summary of next steps that were necessary to address the Company's "reduced profitability, increased costs, and the impact on the FY21 EBITDA forecast."  Five days later, on March 16, 2021, Defendant Fiorentino wrote to Defendants Bonham, Davis, Casella, and Damiano that there were "very high hurdles for gross margin/EBITDA year over year starting in April." Despite this, he noted that the focus was still on a "dividend path to private deal," meaning a dividend recapitalization.

60.    As the days passed, other management-level employees similarly expressed concern that the Company would continue to suffer from spiraling freight costs well beyond March 2021.  On March 19, 2021, a Company vice president stated that "ocean freight increases will be persistent," and that the increasing freight costs plaguing the Company and the global supply chain would not be "short term/temp."  The Company's Treasurer told the CFO that "it seems like [freight expenses] ha[ve] been going up every month since the first of the year."  On information and belief, the Founder Defendants and PHGP Defendants began holding "all hands" meetings to discuss how to handle the soaring freight and shipping costs, which were quickly burning up the Company's cash resources and risked making the Company's financial position untenable.

61.    Despite this internal discussion, the Company's projections that Defendants used to justify and support the incurrence of the loan and the issuance of the Dividend did not reflect Defendants' knowledge that the Company would continue to suffer from increased freight and shipping costs and that costs would continue to increase after consummation of the transaction.  In fact, Defendants knew that the projections upon which they relied to promote and justify the dividend recapitalization failed to account for the increased freight and shipping expenses the

Company had encountered since at least as early as October 2020, or the resulting erosion in EBITDA that Defendants knew would continue to occur. In fact, Defendants did not even properly account for the EBITDA misses that they knew had already resulted from these issues and other performance challenges. Moreover, Defendants were aware that the Company's financial projections were unreasonably high and ignored reality in order to justify the dividend. As the Company's President lamented weeks after the dividend was issued, "we were saying from the beginning that the forecast for this year was way too high and no one listened."

62.     To the contrary, knowing that they could not hide the problems entirely, Defendants sought to downplay their impact. At the same time that Defendants and Walker Edison management were discussing the "persistent" and "inevitable" increases in freight and shipping costs and the "erosion in our profit profile"—as Defendant Bonham put it—caused by those increases that were not accounted for in the financial projections, Defendants were telling prospective lenders that the issues had been resolved. For example, in a confidential information memorandum given to lenders in March 2021, Defendants told lenders that although Walker Edison had "experienced unprecedented supply chain challenges" in November 2020, it "has since worked through the supply chain challenges, which no longer pose an issue" and that "[t]he Company's January 2021 performance recovered well from December 2020, as the supply chain challenges subsided and Walker Edison continued to experience increased demand." This statement came at the same time that Defendant Bonham was telling management internally, "I don't see ocean freight or fedex costs reverting" and the Company's president was warning Bonham, Davis, and the PHGP Defendants of "reduced profitability, increased costs, and the impact on the FY21 EBITDA forecast." In addition, on March 24, 2021, days before closing the

new loan, employees of Walker Edison were still grappling with the related errors with the Company's freight accounting, noting that there had been "$6.4 million of freight costs" that were "not being allocated to inventory timely."

63.     As problems mounted, the Company was forced to take drastic steps to deal with its lack of liquidity to pay ongoing debts due to its deteriorating financial condition.   On information and belief, not later than March 2021, the Company started to intentionally delay payments to certain critical vendors to manage its cash liquidity.  While helpful on paper to slow cash burn, delaying critical vendor payments caused material risk to the Company's relationships and business going forward.

64.     The Founder Defendants and PHGP Defendants were aware of the liquidity crisis faced by the Company and were advised of various measures Company management was proposing to deal with the Company's growing inability to pay its debts.  On March 3-8, 2021, for example, the Company's CFO requested that a cash flow four-week forecast be drawn up showing that the Company would only be able to pay 86% of what it was scheduled to pay to its suppliers in China and Brazil, and stated that he was "going to talk to [Defendant Bonham], [Walker Edison's President], and [Defendant Davis] today about pushing orders out," *i.e.*, delaying critical orders from suppliers, "since we aren't hitting sales goals."

65.     As of at least March 17, 2021, management expressed concern that the Company's factory relationships—absolutely essential to the Company's business and survival—could be seriously jeopardized if the Company continued to stretch payments beyond due dates for orders that it had placed, and debated which part of the Company was better positioned to "weather this storm."

66.     Defendant Bonham also started pushing the idea of slashing hiring at the Company given the dire financial conditions, telling Defendant Davis and others on the management team, "revenue miss plus increasing expenses = stop hiring."  However, this formula did not stop Defendants from causing the Company to incur $300 million in debt (resulting in increased debt service costs) to fund an approximately $210 million distribution to line their own pockets.

67.     By March 18, 2021, the Company had completed an internal projection showing that it would exceed its borrowing capacity under its asset based loan facility (the "**ABL Facility**")—the Company's key source of liquidity—by May 2021.  Incredibly, the projection showed that the Company would burn through more than $100 million in cash—which it did not have—by December 2021.  On that same date, March 18, the Company's President advised Defendants Bonham, Davis, Fiorentino, Damiano, and Casella as members of the Walker Edison Board that the Company should delay certain critical hiring and implement a 31% reduction in hiring of non-critical roles "immediately" and not reintroduce non-critical hiring until "performance improves."

68.     The Company's actual performance with respect to freight and shipping delays and increased costs not only impacted its cash liquidity in the form of reduced profits, it also reduced the Company's ability to access the bank borrowing that was essential for it to meet its debts.  Specifically, the freight and shipping issues had an immediate impact on the Company's ability to borrow cash under its ABL Facility.  Prior to the Company obtaining debt financing and issuing the Dividend in March 2021, the Company's ABL Facility had a maximum loan capacity of $55 million.  In connection with incurrence of the debt financing, on March 31, 2021, the ABL Facility

was also amended to increase the available loan capacity to $75 million.  Even prior to that amendment, however, the Company's ability to access that facility was uncertain.

69.    On March 26, 2021, the Company's CFO sent an email to representatives of Prospect Hill and to the Company's lender under the ABL Facility telling them that (a) the Company's projections (which were used to justify the new loan and the issuance of the Dividend) depended on the Company having access to the full $75 million available under the ABL Facility, but (b) delays in shipments of the Company's inventory would preclude the Company from borrowing the full amount it needed under the ABL Facility because the inventory necessary to supply the necessary collateral had been averaging in-transit times far beyond the lender's permitted 45-day time limits.  Defendants ultimately declined to make a request to the ABL lender to increase the limits because Defendant Casella responded that he did not want such a request to "slow down the process," and the CFO agreed that doing so could jeopardize Defendants' ability to "stay on the current timeline for close"—*i.e.*, meaning the "timeline" and the "process" by which Defendants were to cause Walker Edison to incur $300 million in new debt so that they could take the $210 million Dividend out of the Company only a few days later.

**D.**    **Defendants Caused the Company to Borrow $300 Million to Fund an Approximately $210 Million Dividend to Themselves.**

70.    Even though Defendants knew that the Company was seeing a dramatic "erosion" in its "profit profile," and that the Company's financial statements and projections contained material inaccuracies, they nevertheless plowed ahead, undeterred in their desire to cash out of the business.  Having failed to obtain other financing, their only remaining course was to cause Walker Edison to incur $300 million in new secured debt on March 31, 2021, for the purpose of issuing an immediate dividend of approximately $210 million for their own benefit.

71.    Walker Edison, as Borrower, and Walker Edison Intermediate and the Company's subsidiaries, as Guarantors, entered into a loan agreement, dated March 31, 2021 (the "**Loan Agreement**").  Under the Loan Agreement, Walker Edison incurred $300 million of new secured debt (the "**New Secured Loan**") from its lenders.  The New Secured Loan resulted in $294,921,250 in net cash for the Company.  However, Defendants did not permit a single dollar of the New Secured Loan to be kept by the Company to fund its ongoing operating costs or to solve its known liquidity issues.  Rather, 100% of the proceeds of the New Secured Loan were used to pay transaction fees, pay off existing debt of $82,874,156.25, and to fund the Dividend, which amounted to $209,320,503.41.  Defendants appear to have attempted to address the Company's liquidity issues by causing the Company to incur even more debt by increasing the loan capacity under the ABL Facility from $55 million to $75 million, notwithstanding the $300 million term loan debt they had just caused the Company to incur.  Yet, projections and internal emails showed that even this increased loan capacity under the ABL Facility would either not be available or would be insufficient given the Company's substantial liquidity needs and cash burn.

72.    Had Defendants observed corporate formalities, the Dividend would have been distributed through the Company's corporate structure—(i) first to Walker Edison Intermediate, (ii) then to Walker Edison Holding, and (iii) then to the beneficial owners of Walker Edison Holding.  The Dividend, however, was not distributed in accordance with this corporate structure. Rather, it was paid in cash directly by Walker Edison to Defendants JWC-WE Holdco, Inc. (on information and belief, an entity owned and/or controlled by Prospect Hill), MB & BB Holdings, LLC (on information and belief, an entity owned and/or controlled by Brad Bonham), and Matthew Davis (collectively, the "**Wrongful Distribution Defendants**").  The cash amounts of the

Dividend transferred to the Wrongful Distribution Defendants (the "**Transfers**") are reflected in the below chart.

| Transfer Recipient | Transfer Amount |
|---|---|
| JWC-WE Holdco, Inc. | $119,895,590.37 |
| MB & BB Holdings, LLC | $66,143,473.13 |
| Matthew Davis | $22,049,157.32 |

73.    In addition to the Transfers to the Wrongful Distribution Defendants, the Company also distributed $1,232,282.60 of the Dividend for certain senior employee profit interests.  As with the Dividend payouts, the Company did not receive any of the funds distributed to these employee recipients.

74.    The Transfers were made to and for the benefit of the Wrongful Distribution Defendants, each of which were either insiders and controlling owners of Walker Edison or controlled by insiders or controlling owners of Walker Edison.  Walker Edison received no consideration in return for the Transfers.

75.    Not only did the Dividend strip the Company of loan proceeds that should have been used to address its liquidity and performance issues, the $300 million New Secured Loan that funded the Dividend left the Company with substantially increased debt and monthly cost of debt service.  Prior to the consummation of the Loan Agreement and Dividend, the Company had less than $83 million in funded term loan debt and had approximately $22 million outstanding under the ABL Facility that had a borrowing limit of $55 million.  After consummation of the Loan Agreement and the Dividend, the Company had $300 million in funded term loan debt under the Loan Agreement, with an increased borrowing limit under the ABL Facility of $75 million.  As a result of the closing of the Loan Agreement, the cost of the Company's monthly debt service therefore more than tripled, from an average of approximately $640,000 per month in the six

months prior to the closing of the Loan Agreement to an average of approximately $2 million per month in the six months following the closing of the Loan Agreement.

76.     In other words, the Loan Agreement that funded the Dividend more than tripled the Company's interest expense and increased the required cash necessary to fund the Company's debt by more than $1.4 million per month at a time when the Company was already experiencing liquidity and cash problems and an inability to pay debts as they came due in the ordinary course of the Company's activities and affairs.  At the same time, the Dividend depleted the Company of approximately $210 million of cash that could have been used to mitigate the Company's operating losses and fund its debt payments.

## V.     AS DEFENDANTS FORESAW, WALKER EDISON'S ACTUAL PERFORMANCE DID NOT IMPROVE AFTER CLOSING THE NEW SECURED LOAN.

77.     Contrary to Defendants' misleadingly positive portrayal of the Company's financial health, in the weeks leading up to the closing of the New Secured Loan and the issuance of the Dividend, the Company's actual gross profit and EBITDA were lower than the projections Defendants had provided to obtain the New Secured Loan.  In reality, the Company was facing a severe liquidity shortage and significant increases in expenses (primarily freight, shipping, and distribution center costs) that were not likely to dissipate soon.  Defendants were aware that as of the time they received the Dividend that the Company would not be able to pay its debts as they came due in the ordinary course of the Company's activities and affairs.  This was borne out almost immediately after the closing of the New Secured Loan and the issuance of the Dividend.

78.     Following the issuance of the Dividend on March 31, 2021, the Company missed the projections they had presented to lenders and used to justify the Dividend by a material margin. The Company's actual 2021 net sales of $399.6 million fell more than ***$100 million short*** of its

projected forecast of $504.2 million. And its 2021 actual reported EBITDA of negative $1.6 million fell well short of its projected $104.4 million.

79. These significant misses reflected the fact that the monthly financials and financial forecasts that Defendants used to justify the Dividend prior to the transaction closing on March 31, 2021, did not reflect the operative reality of the Company due to Defendants' failure to properly allocate freight expenses for accounting purposes, and due to the persistent increase in freight, shipping, and other costs that the Company experienced in the months preceding and following the issuance of the Dividend. Moreover, the Company's freight and shipping issues prior to the March 31, 2021, closing did not only impact expenses. The Company began experiencing delayed delivery times to customers prior to the incurrence of the New Secured Loan and issuance of the Dividend, which resulted in increased out-of-stock rates and diminished on-time shipment rates. This, in turn, negatively affected the Company's page placement with its e-commerce platforms, resulting in declining sales.

80. The Company's actual financial information, which was known to Defendants, showed significant financial headwinds and liquidity problems well before the Dividend was paid. Based on this, Defendants should have refrained from extracting hundreds of millions of dollars from the Company while taking on massive new debt, because such actions immediately jeopardized the Company's ability to continue operations and pay its debts on time.

81. Had Defendants used the true financial information that was available to them, neither Defendants nor the Company could have rationalized borrowing and paying the Dividend of approximately $210 million solely from borrowed funds.

## VI.    THE COMPANY ENGAGED IN AN ADDITIONAL EQUITY TRANSACTION.

82.    Defendants' efforts to use the Company to line their own pockets did not stop with the Dividend issued in March 2021, notwithstanding the fact that the Defendants knew that the Company's performance continued to falter at the expense of its creditors.  Rather, in May 2021, Defendants irresponsibly sought and obtained an additional $250 million equity investment from a New York-based private equity growth firm in Walker Edison Holding.  As with the New Secured Loan, this additional investment was, incredibly, used to fund a second massive dividend to Defendants.  Like the Dividend issued in March 2021, barely any of this cash infusion was used to help fund the Company's operations and get it back on its feet.  Ultimately, very little, if any, of the $250 million investment was distributed to Walker Edison, a *de minimis* amount compared to the size of the dividends, and to the cash needed by Walker Edison to solve its continued liquidity and operations problems.  Following the additional equity investment, the Company's continuing insolvency only worsened.

## VII.    WALKER EDISON WAS EFFECTIVELY INSOLVENT WHEN THE COMPANY ISSUED THE DIVIDEND.

83.    As a result of the financial difficulties described above, rational projections of the Company's performance and cash flow based on the information actually known by the Defendants would have shown that Walker Edison was insolvent, unable to pay its debts as they came due, and/or would be left with unreasonably small assets at the time of, or as a result of, the Dividend.  It was clear internally that the Company would have little cash to help "weather this storm" that it was facing, and that the combination of the "erosion in our profit profile" that Defendant Bonham identified and the increase in operating and debt expenses would leave the Company in an untenable position financially.  Defendants, however, refused to correct their

materially misleading projections to conform to what they knew. Defendants therefore received the Dividend with knowledge that Walker Edison would not be able to pay its debts as they came due in the ordinary course of the Company's activities and affairs and would be left with total assets less than total liabilities and otherwise unreasonably small assets in relation to its business.

84. Throughout 2021, based on facts and circumstances that existed as of the Company's entry into the Loan Agreement and issuance of the Dividend, Walker Edison experienced a significant cash shortage and struggled and failed to pay its manufacturers on time. This forced the Company to choose which manufacturers would get paid and which ones would have to wait. The Company's liquidity was not improved by the imposition of the New Secured Loan, as the Company's debt service load increased tremendously, and no proceeds of that loan were made available to the Company for anything other than distribution of the Dividend, repayment of existing debt, or payment of transaction fees. After the closing of the New Secured Loan and the issuance of the Dividend, the Company was only able to fund operations through the later incurrence of more debt and new infusions of equity capital, neither of which was reasonably certain or guaranteed to occur when the Dividend was distributed.

85. As detailed above, the Company's ability to borrow cash under its ABL Facility was limited. And by March 18, 2021, the Company's internal projections showed that it would exceed its borrowing capacity under its ABL Facility—its key source of liquidity—by May 2021 and would burn through over $100 million in cash by December 2021. Therefore, the Defendants knew when they received the Dividend that the Company would be left with total assets less than total liabilities and otherwise unreasonably small assets at the time of, or as a result of, the issuance of the Dividend and would be unable to pay its debts as they became due.

86.     Such anticipated problems were borne out as the months passed.  As of March 31, 2021, the Company had borrowed approximately $22 million under its $75 million ABL Facility. Less than five months later, in August 2021, the Company increased the availability under its ABL Facility to $100 million.  By the end of 2021, the Company had fully drawn the amount available under the ABL Facility, made necessary by the Company's continued failure to meet its projections, which failure was the inevitable consequence of facts and circumstances known and reasonably knowable to Defendants as of March 2021, if not earlier.

87.     Even the increase in availability under the ABL Facility was not sufficient to prevent the Company from running out of cash in 2021.  Between September and December 2021, the Company was forced to obtain an additional $60 million in cash through capital contributions made by the Defendants and other shareholders.  During this period, Defendant Bonham angrily told Defendants Damiano and Casella that "everyone knows ocean freight isn't abating anytime soon."  Describing the Company's financial position, Defendant Bonham was unsparing and blunt, stating that "the house is on fire," the situation was "precarious," and the Company should fire all Company employees not deemed "mission critical."   In the face of these challenges, having authorized not just one but two gigantic dividends to himself and the other Defendants in 2021 at the expense of Walker Edison's financial viability, Defendant Bonham told Defendants Damiano and Casella that "honestly, I want to sail off into the sunset."

88.     Moreover, because Defendants negotiated the Loan Agreement without properly taking account of the Company's negative financial condition and performance at that time, within months of issuing the Dividend, the Company was in danger of breaching the financial covenants under the Loan Agreement that Defendants caused in order to fund their own massive $210 million

4878-0882-8003

dividend. Specifically, during the life of the New Secured Loan, the Company was required to maintain a specific "Total Net Leverage Ratio," which was to be tested quarterly. The Company was unable to even satisfy the *very first* such test on September 30, 2021, however, something that Defendants knew and understood was likely before receiving the Dividend, given the "erosion" of the Company's profit profile and the fact that Defendants "[didn't] see ocean freight and fedex costs reverting," as Defendant Bonham put it.

89.    In fact, by July 2021, only four months after they received the $210 million Dividend, Defendants had informed Walker Edison's lenders that the Company's financial picture was so bleak that it may breach the Total Net Leverage Ratio covenant under the Loan Agreement. Further, on August 27, 2021, Defendants notified Walker Edison's lenders that, due to the additional pressures and an influx of pre-bought inventory, the Company was facing a severe liquidity crisis and likely only had two to four *weeks* of liquidity left.

90.    The Company's insolvency was known and knowable to Defendants at the time of the Dividend and New Secured Loan. The failure to satisfy the Total Net Leverage Ratio covenant under the Loan Agreement, if not timely cured, threatened to constitute an "Event of Default" under the Loan Agreement, which would allow the full amount of the New Secured Loan to be accelerated and become immediately due, meaning that the full, approximately $300 million New Secured Loan would have been immediately due and payable, a consequence that would have caused the Company to fall into bankruptcy. The Company did not have sufficient cash or refinancing capability to pay such debt when due. Based on the facts and circumstances known by Defendants but concealed from lenders, as of March 31, 2021, when they extracted the $210 million Dividend, the Company did not have a realistic chance of satisfying the Total Net

Leverage Ratio covenant under the Loan Agreement and was otherwise unable to satisfy its debts as they came due in the ordinary course of business.

## VIII.  DEFENDANTS EXECUTE A RESTRUCTURING SUPPORT AGREEMENT AND CHANGE OF CONTROL.

91.    By January 2023, it became clear that, due to Defendants' profligate misuse of Walker Edison's financial resources and debt capacity, the Company would not be able to survive without more drastic action.  Accordingly, Walker Edison, its investors, and the lenders under the Loan Agreement entered into a Restructuring Support Agreement, dated January 27, 2023 (the "**RSA**").  The purpose of the RSA was to (i) preserve and maximize the value of the Company by improving its balance sheet, (ii) provide necessary liquidity to address the Company's operating needs by providing for an additional $13 million loan under the Loan Agreement, (iii) preserve employee jobs, and (iv) satisfy the Company's ongoing obligations.  Under the RSA, Walker Edison's lenders assumed ownership and control over Walker Edison Intermediate, and, in turn, Walker Edison and its subsidiaries.

92.    By early 2023, Defendants' wasteful and unnecessary looting of Walker Edison, a once-successful Utah-based global furniture business, had jeopardized the long-term survival of the Company.  Defendants, in the face of this disastrous result and having improperly caused a massive liquidity event at the worst possible time simply to line their own pockets, quietly exited the Company, leaving the Company's lenders to pick up the pieces and rebuild.

93.    Prior to the filing of this Complaint, the Company and Walker Edison Intermediate have entered into a tolling agreement to preserve any claims the Company may have against Walker Edison Intermediate, which is now under common ownership with the Company.

## CAUSES OF ACTION

### COUNT I:  Wrongful Distribution Under Utah Code §§ 48-3a-405, 48-3a-406(3)

*(Against Defendants JWC-WE Holdco, Inc., MB & BB Holdings, LLC, Matthew Davis, and Walker Edison Holding Company, LLC)*

94.    Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

95.    On or around March 31, 2021, Walker Edison issued the Dividend through direct distributions to the Wrongful Distribution Defendants as follows:

| Transfer Recipient | Transfer Amount |
|---|---|
| JWC-WE Holdco, Inc. | $119,895,590.37 |
| MB & BB Holdings, LLC | $66,143,473.13 |
| Matthew Davis | $22,049,157.32 |

96.    In addition, on information and belief, Walker Edison Holding also received a legal right to some or all of the Dividend pursuant to its operating agreement or other governance documents, and therefore can be considered a recipient of the Dividend.  The knowledge and conduct of the Defendants can be imputed to Walker Edison Holding based on their positions as agents, representatives, officers, directors, and/or owners of Walker Edison Holding.

97.    After the Dividend, Walker Edison was unable to pay its debts as they came due in the ordinary course of Walker Edison's activities and affairs, including payments to manufacturers and suppliers and its obligations under the Loan Agreement.  To continue operations in 2021, the Company required an additional $60 million in equity contributions and an additional $20 million in availability under the ABL Facility.

98.    After the Dividend, Walker Edison's financial statements showed that its total assets were less than the sum of its total liabilities.

99.     The financial statements and valuation analyses used to support the propriety of the Dividend were not reasonable under the circumstances.  Among other reasons, those financial statements and valuations were based on the Company's unreasonable failures to properly account for estimated and actual freight costs, looming out-of-stock inventory and delayed deliveries, revenue impacts from detrimental placement of the Company's products on e-commerce partners' platforms, and excessive inventory costs, and they were based on unreasonable and faulty projections that did not match the reality of the Company's financial condition.

100.    At the time of the Dividend, the Wrongful Distribution Defendants and Walker Edison Holding knew that the Company would not be able to pay its debts as they became due in the ordinary course of the Company's activities and affairs, and that Walker Edison's total assets were less than the sum of its total liabilities, and therefore, that the Dividend violated Utah Code § 48-3a-405.

101.    Accordingly, each Wrongful Distribution Defendant and Walker Edison Holding is personally liable to Walker Edison for the Dividend amount received by such Defendant which exceeds the amount that could have been distributed without violation of Utah Code § 48-3a-405.

**COUNT II:  Constructive Fraudulent Transfer Under Utah Code §§ 25-6-202, 203, 304 And Other Equivalent State Laws**
***(Against Defendants Brad Bonham, Matthew Davis, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100)***

102.    Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

103.    Walker Edison holds valid and legally enforceable claims arising out of the Dividend against the Wrongful Distribution Defendants and Walker Edison Holding under Utah Code §§ 48-3a-405 and 48-3a-406(3).

104.    In addition, at the time of the Dividend, Walker Edison was a member-managed limited liability company under the laws of the State of Utah and under control of the Defendants. Walker Edison Intermediate was the sole member of Walker Edison, and, on information and belief, consented to the Dividend, and in doing so did not comply with Utah Code § 48-3a-409. Walker Edison holds valid and legally enforceable claims arising out of the Dividend against Walker Edison Intermediate under Utah Code §§ 48-3a-405, 48-3a-406(1), and 48-3a-409.

105.    On information and belief, after completion of the Dividend by Walker Edison, the Wrongful Distribution Defendants, Walker Edison Holding, and Walker Edison Intermediate subsequently transferred some or all of the proceeds of the Dividend (collectively, the "**Uptier Transfers**") to persons or entities, including Brad Bonham, Matt Davis, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., and Prospect Hill Growth Fund II Co-Invest, L.P., and certain Doe defendants who have not yet been identified (collectively, the "**Uptier Transfer Defendants**").

106.    On information and belief, the Wrongful Distribution Defendants, Walker Edison Holding, and Walker Edison Intermediate did not receive reasonably equivalent value for the Uptier Transfers.

107.    On information and belief, at the time of the Uptier Transfers, Defendants JWC-WE Holdco, Inc. and MB & BB Holdings, LLC, as well as Walker Edison Holding and Walker

Edison Intermediate, were engaged, or were about to be engaged, in a business or a transaction for which their remaining assets were unreasonably small in relation to their business or transaction.

108.    On information and belief, at the time of the Dividend, Defendants JWC-WE Holdco, Inc. and MB & BB Holdings, LLC, as well as Walker Edison Holding and Walker Edison Intermediate, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they came due.

109.    On information and belief, Defendants JWC-WE Holdco, Inc. and MB & BB Holdings, LLC, as well as Walker Edison Holding and Walker Edison Intermediate, were insolvent at the time of the applicable Uptier Transfers, or became insolvent as a result of the applicable Uptier Transfers.

110.    The Uptier Transfer Defendants and any immediate or mediate transferee of the Uptier Transfer Defendants did not receive any interests or proceeds of the Uptier Transfers in good faith or for value.

111.    The Uptier Transfers are avoidable as constructive fraudulent transfers under Utah Code §§ 25-6-202 and 203.  Under Utah Code § 25-6-304, Walker Edison is entitled to a judgment against the Uptier Transfer Defendants or any immediate or mediate transferee thereof for the lesser of the value of the Uptier Transfers or the amount necessary to satisfy Walker Edison's claims against the Wrongful Distribution Defendants, Walker Edison Holding, and Walker Edison Intermediate, together with prejudgment interest from the date of such transfers, costs, all other relief set forth in Utah Code § 25-6-303, or compensatory damages in an amount to be determined for the value thereof, and any further relief that this Court deems just, fair, and equitable.

**COUNT III: Actual Fraudulent Transfer Under Utah Code § 25-6-202 And Other Equivalent State Laws**
**(*Against Defendants Brad Bonham, Matthew Davis, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100*)**

112.    Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

113.    Walker Edison holds valid and legally enforceable claims arising out of the Dividend against the Wrongful Distribution Defendants under Utah Code §§ 48-3a-405 and 48-3a-406(3).

114.    In addition, Walker Edison is a member-managed limited liability company under the laws of the State of Utah.  Walker Edison Intermediate is the member of Walker Edison, and, on information and belief, consented to the Dividend, and in doing so did not comply with Utah Code § 48-3a-409.  Walker Edison holds valid and legally enforceable claims arising out of the Dividend against Walker Edison Intermediate under Utah Code §§ 48-3a-405, 48-3a-406(1), and 48-3a-409.

115.    On information and belief, after completion of the Dividend by Walker Edison, the Wrongful Distribution Defendants, Walker Edison Holding, and Walker Edison Intermediate subsequently made the Uptier Transfers to the Uptier Transfer Defendants.

116.    The Uptier Transfers were made with an actual intent to hinder, delay, and/or defraud creditors of the Wrongful Distribution Defendants, Walker Edison Holding, and Walker Edison Intermediate, to the detriment and harm of their creditors, including Walker Edison.  Such intent can be inferred from several badges of fraud, as set forth in Utah Code § 25-6-202(1)(a), including, among other things, on information and belief:  (i) the Uptier Transfers were made to

and for the benefit of Defendants or their related entities, each of which was an insider of the applicable debtor; (ii) the Uptier Transfers were of substantially all of the applicable debtor's assets; (iii) the value of the consideration received by the debtor was not reasonably equivalent to the value of the Uptier Transfers; (iv) Defendants JWC-WE Holdco, Inc. and MB & BB Holdings, LLC, as well as Walker Edison Holding and Walker Edison Intermediate, were insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and (v) the Uptier Transfers occurred shortly after a substantial debt was incurred in the form of the obligation of the debtor to return the Dividend.

117.     The Uptier Transfers are avoidable as actual fraudulent transfers under Utah Code §§ 25-6-202 and 203.  Under Utah Code § 25-6-304, Walker Edison is entitled to a judgment against the Uptier Transfer Defendants or any immediate or mediate transferee thereof for the lesser of the value of the Uptier Transfers or the amount necessary to satisfy Walker Edison's claims against the Wrongful Distribution Defendants, Walker Edison Holding, and Walker Edison Intermediate, together with prejudgment interest from the date of such transfers, costs, all other relief set forth in Utah Code § 25-6-303, or compensatory damages in an amount to be determined for the value thereof, and any further relief that this Court deems just, fair, and equitable.

### COUNT IV: Breach of Fiduciary Duty
*(Against Defendants Walker Edison Holding, JWC-WE Holdco, Inc., MB & BB Holdings, LLC, Brad Bonham, Matthew Davis, Phil Damiano, Ken Murphy, Adam Suttin, Kyle Casella, and David Fiorentino)*

118.     Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

119.     The Wrongful Distribution Defendants, Walker Edison Holding, Brad Bonham, Phil Damiano, Ken Murphy, Adam Suttin, Kyle Casella, and David Fiorentino (collectively, the

"**Controlling Defendants**"), as members of the Board and/or controlling shareholders of Walker Edison owed fiduciary duties of care, loyalty, and good faith to Walker Edison.

120.    The Walker Edison operating agreement in effect at all times relevant to this Complaint, which was signed by Defendants Bonham and Davis, did not alter or eliminate the duties of loyalty, care, or good faith and fair dealing owed by Controlling Defendants to Walker Edison under Utah law, nor did it specify any method by which a specific act or transaction that would otherwise violate the duty of loyalty could be authorized or ratified by one or more disinterested and independent persons after full disclosure of all material facts.

121.    The Controlling Defendants' duty of care obligated them to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

122.    The Controlling Defendants' duty of loyalty obligated them to refrain from dealing with Walker Edison in the conduct of its activities as a person having an interest adverse to the Company.

123.    The Controlling Defendants were obligated to discharge their duties and obligations under applicable law and in accordance with the Walker Edison operating agreement and in the exercise of rights consistent with the contractual obligation of good faith and fair dealing.

124.    The Controlling Defendants exerted direct control over the assets of Walker Edison by, among other things, causing Walker Edison to incur debt and distribute the Dividend to the Wrongful Distribution Defendants, and they did so to their own advantage and at the expense of Walker Edison.

125.    In causing Walker Edison to incur debt and distribute the Dividend to the Wrongful Distribution Defendants, the Controlling Defendants failed to refrain from engaging in grossly

negligent or reckless conduct, intentional misconduct, or a knowing violation of law, dealt with Walker Edison in the conduct of its activities as persons having interests adverse to the Company, and acted inconsistently with the contractual obligation of good faith and fair dealing.

126.    The Controlling Defendants were required not to plunder Walker Edison for their benefit, or for the benefit of its controlling shareholders and parent limited liability companies.

127.    The Controlling Defendants similarly breached the duties of care, loyalty, and good faith and fair dealing in causing Walker Edison to issue the Dividend at a time when it was effectively insolvent, inadequately capitalized, and unable to pay its debts as they came due in the ordinary course of its activities and affairs.

128.    The Controlling Defendants' wrongful conduct in breach of their duties was not ratified or authorized after full disclosure of all material facts.

129.    The Controlling Defendants' wrongful conduct in breach of their duties was not fair to Walker Edison.

130.    The Controlling Defendants' wrongful conduct in breach of their duties directly and proximately caused damage to Walker Edison and improperly extracted monies from Walker Edison.

131.    Walker Edison is entitled to damages and restitution of the amounts improperly taken from Walker Edison as a result of the Controlling Defendants' wrongful conduct.

132.    Walker Edison is entitled to disgorgement of all ill-gotten gains to the Controlling Defendants as a result of their wrongful conduct.

133.    Walker Edison is entitled to recover punitive damages by reason of the wanton, willful, reckless, and malicious acts of the Controlling Defendants.

### COUNT V:  Breach of the Implied Covenant of Good Faith and Fair Dealing
**(*Against Defendants Walker Edison Holding, JWC-WE Holdco, Inc., MB & BB Holdings, LLC, Matthew Davis, Brad Bonham, Phil Damiano, Ken Murphy, Adam Suttin, Kyle Casella, and David Fiorentino*)**

134.    Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

135.    Under the controlling LLC operating agreements, the Controlling Defendants had an implied obligation to deal with Walker Edison consistent with their implied obligations of good faith and fair dealing.

136.    The Controlling Defendants breached the implied covenant of good faith and fair dealing that is contained in every contract.

137.    The Controlling Defendants were obligated to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

138.    The Controlling Defendants were obligated to refrain from dealing with Walker Edison in the conduct of its activities as a person having an interest adverse to the Company.

139.    The Controlling Defendants were obligated to discharge their duties and obligations under applicable law and in accordance with the Walker Edison operating agreement and in the exercise of rights consistent with the contractual obligation of good faith and fair dealing.

140.    The Controlling Defendants exerted direct control over the assets of Walker Edison by, among other things, causing Walker Edison to incur debt and distribute the Dividend to the Wrongful Distribution Defendants, and they did so to their own advantage and at the expense of Walker Edison.

141.    In causing Walker Edison to incur debt and distribute the Dividend to the Wrongful Distribution Defendants, the Controlling Defendants failed to refrain from engaging in grossly

negligent or reckless conduct, intentional misconduct, or a knowing violation of law, dealt with Walker Edison in the conduct of its activities as persons having interests adverse to the Company, and acted inconsistently with the contractual obligation of good faith and fair dealing.

142.    The Controlling Defendants were required not to plunder Walker Edison for their benefit, or for the benefit of its controlling shareholders and parent limited liability companies.

143.    The Controlling Defendants similarly breached their obligation of good faith and fair dealing in causing Walker Edison to issue the Dividend at a time when it was effectively insolvent, inadequately capitalized, and unable to pay its debts as they came due in the ordinary course of its activities and affairs.

144.    The Controlling Defendants' wrongful conduct was not ratified or authorized after full disclosure of all material facts.

145.    The Controlling Defendants' wrongful conduct was not fair to Walker Edison.

146.    The Controlling Defendants' wrongful conduct directly and proximately caused damage to Walker Edison and improperly extracted monies from Walker Edison.

147.    Walker Edison is entitled to damages and restitution of the amounts improperly taken from Walker Edison as a result of the Controlling Defendants' wrongful conduct.

148.    Walker Edison is entitled to disgorgement of all ill-gotten gains to the Controlling Defendants as a result of their wrongful conduct.

### COUNT VI: Aiding and Abetting Breach of Fiduciary Duty
### (*Against All Defendants*)

149.    Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

150.    The Controlling Defendants, as members of the Board and/or controlling shareholders of Walker Edison, owed fiduciary duties of care, loyalty, and good faith to Walker Edison.

151.    In causing Walker Edison to distribute the Dividend to the Wrongful Distribution Defendants, the Controlling Defendants breached their fiduciary duties of care, loyalty, and good faith to Walker Edison.

152.    The Defendants knew that the Controlling Defendants owed fiduciary duties to Walker Edison.

153.    The Defendants also knew that the Controlling Defendants were in breach of their fiduciary duties to Walker Edison.

154.    The Defendants knowingly provided substantial assistance and encouragement to the Controlling Defendants to breach their fiduciary duties to Walker Edison.

155.    Each Defendant therefore aided and abetted the Controlling Defendants' breach of their fiduciary duties to Walker Edison.

156.    As a result of the Defendants' bad acts, the Defendants are jointly responsible with the Controlling Defendants for the damages to Walker Edison resulting from those breaches.

### COUNT VII:  Civil Conspiracy
### (*Against All Defendants*)

157.    Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

158.    Defendants and their representatives formed a combination of two or more persons.

159.    Defendants each sought to accomplish the object of causing Walker Edison to pay out the Dividend for their own benefits and for the benefits of their affiliates and assigns.

160.    Defendants had a meeting of the minds to accomplish their object by seeking to have the Company take out a large loan in order to finance the Dividend.

161.    Defendants conspired to and participated in the commission of one or more unlawful, overt acts, in furtherance of their object, including causing the Company to distribute the Dividend to the Wrongful Distribution Defendants and others.

162.    Walker Edison has suffered damages as a direct result of these actions.

## COUNT VIII: Unjust Enrichment
### (*Against All Defendants*)

163.    Walker Edison restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

164.    This unjust enrichment claim is asserted in the alternative, in the event the remedies asserted in Counts I–VII do not provide an adequate remedy at law.

165.    Defendants received benefits when they wrongfully received the Transfers and/or the Uptier Transfers.

166.    Defendants knowingly and voluntarily accepted and retained benefits in the form of the Transfers and/or the Uptier Transfers.

167.    The circumstances alleged in this Complaint render Defendants' retention of those benefits unjust and inequitable.

168.    Defendants have been unjustly enriched at the expense of Walker Edison in the amount of the Transfers and/or the Uptier Transfers, and Walker Edison is entitled to judgment in those amounts.

169.    Walker Edison is entitled to the return of the Transfers and/or the Uptier Transfers through disgorgement or any other applicable remedy and judgment against the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Walker Edison respectfully requests the Court enter judgment as follows:

a.      On its first Cause of Action, for judgment in favor of Walker Edison and against Defendants JWC-WE Holdco, Inc., MB & BB Holdings, LLC, Matthew Davis, and Walker Edison Holding Company, LLC, awarding Walker Edison's damages in the amount of all improper distributions, plus interest and costs, including, but not limited to, costs and reasonable attorneys' fees incurred in collection of the debt;

b.      On its second Cause of Action, for judgment in favor of Walker Edison and against Defendants Brad Bonham, Matthew Davis, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100:

i.      Pursuant to Utah Code § 25-6-303(1)(a), to satisfy Walker Edison's claim, avoiding and recovering all fraudulent transfers until all funds, assets, and property are recovered by Walker Edison;

ii.     Pursuant to Utah Code § 25-6-303(1)(c)(ii), appointing a receiver; and

iii.    Granting the remedies provided for avoidance and recovery under Utah Code § 25-6-303(1):

(a)     avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(b)     an attachment or other provisional remedy against the asset transferred or other property of the transferee if available under applicable law;

(c)     subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

(i)     an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(ii)    appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(iii)   any other relief the circumstances may require;

c.    On its third Cause of Action, for judgment in favor of Walker Edison and against Defendants Brad Bonham, Matthew Davis, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100:

i.     Pursuant to Utah Code § 25-6-303(1)(a), to satisfy Walker Edison's claim, avoiding and recovering all fraudulent transfers until all funds, assets, and property are recovered by Walker Edison;

ii.    Pursuant to Utah Code § 25-6-303(1)(c)(ii), appointing a receiver; and

iii.   Granting the remedies provided for avoidance and recovery under Utah Code § 25-6-303(1):

(a)     avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(b)     an attachment or other provisional remedy against the asset transferred or other property of the transferee if available under applicable law;

(c)    subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

(i)    an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(ii)    appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(iii)    any other relief the circumstances may require;

d.    On its fourth Cause of Action, for judgment in favor of Walker Edison and against Defendants JWC-WE Holdco, Inc., MB & BB Holdings, LLC, Brad Bonham, Matthew Davis, Walker Edison Holding, Phil Damiano, Ken Murphy, Adam Suttin, Kyle Casella, and David Fiorentino, awarding Walker Edison's damages sustained as a result of the breaches of fiduciary duty and an amount of punitive damages, together with attorneys' fees and pre-judgment interest, in an amount to be determined at trial;

e.    On its fifth Cause of Action, for judgment in favor of Walker Edison and against Defendants JWC-WE Holdco, Inc., MB & BB Holdings, LLC, Brad Bonham, Matthew Davis, Walker Edison Holding, Phil Damiano, Ken Murphy, Adam Suttin, Kyle Casella, and David Fiorentino awarding Walker Edison's damages sustained as a result of the breaches of the implied covenant of good faith and fair dealing, together with pre-judgment interest, in an amount to be determined at trial;

f.    On its sixth Cause of Action, for judgment in favor of Walker Edison and against Defendants, awarding Walker Edison's damages sustained as a result of the breaches of fiduciary

duty, together with punitive damages, attorneys' fees, and pre-judgment interest, in an amount to be decided at trial;

g.     On its seventh Cause of Action, for judgment in favor of Walker Edison and against Defendants, awarding Walker Edison's damages sustained as a result of the civil conspiracy, together with punitive damages, attorneys' fees, and pre-judgment interest, in an amount to be decided at trial;

h.     On its eighth Cause of Action, for judgment in favor of Walker Edison and against Defendants, awarding disgorgement and Walker Edison's damages for such unjust enrichment, together with pre-judgment interest, in an amount to be decided at trial; and

i.     On all Causes of Action, for:

    i.     Restitution;

    ii.     Disgorgement of the Transfers and/or the Uptier Transfers;

    iii.     Preliminary and permanent injunctive relief;

    iv.     Attorneys' fees and costs;

    v.     Pre-judgment interest; and

    vi.     Other further relief as is just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial of all issues in this action triable of right by a jury.

4878-0882-8003

DATED May 8, 2023.

PARSONS BEHLE & LATIMER
/s/ Erik Christiansen

Erik Christiansen

*Attorneys for Walker Edison Furniture Company, LLC*

Erik A. Christiansen, USB #7372
Alan Mouritsen, USB #13558
Brian M. Rothschild, USB #15316
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
echristiansen@parsonsbehle.com
amouritsen@parsonsbehle.com
brothschild@parsonsbehle.com

*Co-Counsel for Blue Owl Capital
Corporation*

Michael M. Farhang (admitted pro hac vice)
Ryan S. Appleby (admitted pro hac vice)
Jeffrey C. Krause (admitted pro hac vice)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
mfarhang@gibsondunn.com
rappleby@gibsondunn.com
jkrause@gibsondunn.com

*Co-Counsel for Blue Owl Capital
Corporation*

## IN THE THIRD JUDICIAL DISTRICT COURT

## FOR THE COUNTY OF SALT LAKE, STATE OF UTAH

| | |
|---|---|
| BLUE OWL CAPITAL CORPORATION, | |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | Civil No. 240903251 |
| BRAD BONHAM; MB & BB HOLDINGS, LLC; MATT DAVIS; WALKER EDISON HOLDING COMPANY, LLC; PROSPECT HILL GROWTH PARTNERS, L.P.; JWC-WE HOLDCO, LLC; JWC-WE HOLDINGS, L.P.; PROSPECT HILL GROWTH FUND II, L.P.; PROSPECT HILL GROWTH FUND II CO-INVEST, L.P.; PHIL DAMIANO; KEN MURPHY; ADAM SUTTIN; KYLE CASELLA; DAVID FIORENTINO; AND DOES 1-100, | Judge Robert Faust<br><br>Discovery Tier 3 |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff Blue Owl Capital Corporation ("**Blue Owl**," f/k/a Owl Rock Capital Corporation) brings this Amended Complaint against Defendants pursuant to Utah R. Civ. P. 15(a)(1)(B) for constructive fraudulent transfer, actual fraudulent transfer, civil conspiracy, fraud, aiding and abetting fraud, and unjust enrichment and alleges as follows:

## INTRODUCTION

1.    This action arises from Defendants' intentional and fraudulent scheme to extract $300 million in loan proceeds from Plaintiff and other lenders by obtaining new secured debt using the Utah company they controlled, Walker Edison Furniture Company, LLC ("**Walker Edison**" or the "**Company**"), as the borrower, and then causing the Company to make a nearly $210 million dividend distribution (the "**Dividend**") to themselves and their related entities and affiliates. Defendants induced Plaintiff and the lenders to provide this liquidity and extracted it for their own benefit while the Company was experiencing substantial profit and cash flow degradation, lacked adequate capital, and could not satisfy its debts as they came due.  Plaintiff and the lenders have since been forced to extend at least $66.5 million in additional loans to the Company to maintain operations.

2.    Walker Edison, a Utah-based furniture retailer headquartered in West Jordan, was managed and controlled by Defendants for much of the time relevant to this Complaint.  In 2020 and 2021, Defendants—who at the time controlled the Company, its board, and its senior management—had sought to extract hundreds of millions of dollars from their holdings in Walker Edison despite the Company's challenges.  In March 2021, Defendants used their positions of power to materially misrepresent and misstate Walker Edison's financial position in order to

4864-8601-9280.v1

induce Plaintiff Blue Owl and other financial institutions under the Loan Agreement (defined below) (the "**Lenders**") to loan $300 million in secured debt to Walker Edison. Defendants then immediately used their positions of control to direct that the vast majority of the loan proceeds received by Utah-based Walker Edison—nearly $210 million in cash—be paid to themselves[1] as a Dividend with nearly all of the rest used to replace the Company's existing debt. Had Defendants provided Plaintiff and the other Lenders with accurate financial information and projections for the Company rather than the materially false and misleading information they did provide, the Lenders would not have agreed to provide the financing Defendants used to fund the Dividend to themselves.

3.       At the time of the Dividend transaction, the Company was insolvent. Nevertheless, the Defendants moved forward with a transaction that increased the Company's debt by 3.5 times, from $83 million to $300 million, without providing a single dollar of cash to support the business. Defendants' Dividend exacerbated the Company's ongoing financial struggles and left the Company insolvent, with unreasonably small capital and an inability to pay its debts as they became due as a result of an existential liquidity crisis centered around increased costs, negative cash flow, and numerous inventory problems. Defendants' actions, meanwhile, unlawfully enriched themselves at both the Company's and the Lenders' expense, constituting an egregious fraud on the Lenders, a serious breach of Defendants' fiduciary duties to Walker Edison, and an improper fraudulent transfer.

---

[1] Approximately $1.2 million was distributed to certain employees of the Company as payment on profits interests. Blue Owl does not presently seek to recover from the recipients of these profits interests.

3

**Defendants' Efforts to Extract Value from Their Investment**

4.     The Dividend was a disastrous decision by the Defendants that harmed the Company and the Lenders, and it was aimed exclusively at extracting as much value as possible for Defendants before they could no longer hide the Company's dire circumstances from existing and would-be investors (including the Lenders).  In 2020, seeking to capitalize on a short-term trend of increased revenue prior to late 2020, Defendants first actively sought to monetize their longtime holdings in the Company through a Special Purpose Acquisition Company ("**SPAC**") or other equity transaction.  Defendants were unsuccessful, however, and by late 2020, supply chain difficulties caused by the COVID-19 pandemic began to negatively impact the Company's costs and profitability.  Beginning no later than late 2020 and early 2021, the Company's ocean freight costs were skyrocketing, profitability was down, and Walker Edison was quickly running out of cash.  During this period, it became clear to Defendants that Walker Edison was facing serious financial difficulties.  Given the severity of this situation, senior management and the board regularly discussed the gravity of the Company's financial difficulties and continuously demanded updates from the Company's finance and operational departments.

5.     After a SPAC or equity transaction proved elusive in late 2020 and early 2021, and rather than seeking a transaction that would generate much-needed liquidity and stability for the Company, Defendants settled on a different way to monetize their holdings in the challenging financial environment—a dividend recapitalization, or "recap," a transaction that would involve using their positions of control to cause the Company to take on new (and significantly more) debt in order to simultaneously pay a special dividend to themselves and their affiliates as the Company's equity owners.

6.      In the first quarter of 2021, Defendants made contact with Plaintiff Blue Owl, a specialty finance and business development company that provides loans to U.S. middle market companies and also ultimately served as the administrative agent to the Lenders (including itself) under the new $300 million term loan.  Defendants proposed a potential dividend recapitalization and began providing to Blue Owl the Company's financial results, projections, and models as part of pre-loan diligence.  Critically, while Defendants and others within the Company were focused on the Company's unrelenting financial difficulties, Defendants knowingly provided Blue Owl and the other Lenders with materially false, misleading, and erroneous financial statements and projections that lacked any reasonable basis and did not reflect the actual known current conditions facing the Company.  Because they concealed material issues regarding the Company's spiraling costs and worsening profitability and liquidity position, the projections and financial information Defendants provided to Blue Owl and the other Lenders were materially false and misleading.

**Defendants Conceal and Misrepresent Walker Edison's Financial Condition**

7.      Moreover, at the same time that Blue Owl, Defendants, and Walker Edison were in discussions about a new loan, Defendants were aware of a material accounting error that resulted in dramatic understatement of the Company's freight expenses and was resulting in substantial overstatements of Walker Edison's financial health and performance.  Worse, in March 2021, leading up to the completion of the dividend recap transaction, internal Company projections and models not provided to Blue Owl showed that the Company was severely undercapitalized and did not have the liquidity to pay debts as they came due.  One projection, in fact, showed that the Company would burn through more than $100 million in cash—which it did not have—by December 2021.  Things were so bad at Walker Edison that Defendants were already discussing

the need to start short paying the Company's critical suppliers and to implement immediate and drastic hiring cuts because based on projections not provided to Blue Owl or the other Lenders, the Company would run out of availability under its bank line of credit within weeks.

8.    Defendants were aware of sufficient facts to know at the time of the Dividend, among other things, that (i) the Company had substantial cash flow problems and problems meeting its EBITDA forecasts, would be unable to pay its suppliers on time, and was internally discussing slashes to hiring and other measures to address its liquidity shortage; (ii) the historical financial statements for the Company overstated profitability by failing to properly account for incurred freight expenses that were rapidly increasing; (iii) the Company would be unable to meet the financial covenants required under the Loan Agreement; and (iv) the financial projections used by Defendants to justify the $210 million Dividend were materially inflated and failed to account for the massive increase in expenses the Company had experienced during the preceding months that were expected to persist for the foreseeable future.  Had Defendants disclosed any of this to Blue Owl and the other Lenders, Lenders would not have provided $300 million in new money loans that Defendants used to pay themselves a $210 million Dividend.  Instead, despite full knowledge of the circumstances making the dividend recap transaction wholly improper under such dire circumstances, Defendants plowed ahead undeterred with their material misrepresentations about the Company's condition in order to obtain the Dividend they sought. Even the Company's own President lamented several weeks after Defendants took their nearly $210 million Dividend that "we were saying from the very beginning that the forecast for this year was way too high and no one listened."

**Defendants' Extraction of $210 Million in Cash Leaves Walker Edison Insolvent**

9.    On March 31, 2021, the Loan Agreement closed, and Defendants caused Walker Edison to immediately pay out the $210 million Dividend to Defendants.  At the time of, and as a result of, the Dividend transaction, Walker Edison was insolvent, undercapitalized, and unable to pay its debts as they became due.

10.    The already dire circumstances at Walker Edison only intensified after Defendants withdrew their windfall Dividend payment, consistent with what Defendants knew about market conditions and the Company's situation at the time of the transaction.  In the span of only one year—the very year Defendants decided to take approximately $210 million in badly needed cash out of the Company that could have been used to weather difficult times—the Company burned through over $100 million of cash due in large part to the same spiraling costs and inventory challenges that were known to Defendants prior to the Dividend.  Within just months of receiving their Dividend, Defendants discussed the Company's financial position with statements like "the house is on fire" and "the precarious situation we are in," as they discussed firing all employees who were not "mission critical," and questioned whether the Company would have "the cash and profitability to actually survive this."

11.    The Company's performance never recovered from Defendants' actions.  In fact, by early 2023, unable to reverse the effects of their misconduct, Defendants abandoned the Company in a change-of-control transaction and exited the disaster they had created.  The Lenders assumed ownership and control of the Company and have been forced to lend approximately $66.5 million of new capital to support operations.  Plaintiff Blue Owl and the Lenders are current creditors of the Company.  Plaintiff Blue Owl brings the instant suit on its own behalf as a current lender of the Company and on behalf of the other current Lenders to right this egregious wrong

4864-8601-9280.v1

and to address Defendants' fraudulent transfer of $210 million and to recoup the amount of the loan fraudulently induced by Defendants as well as the amounts of Blue Owl's and the other Lenders' subsequent loans to the Company following the fraudulent transfer. Pursuant to an Assignment and Assumption Agreement, the other Lenders have assigned their claims and causes of action relating to the matters alleged herein to Blue Owl.

## JURISDICTION, VENUE, AND DISCOVERY TIER

12.     Jurisdiction is proper under Utah Code § 78A-5-102(1).

13.     Venue is proper in this Court under Utah Code § 78B-3-307(1)(a) because this is the county in which the causes of action arose, and Utah Code § 78B-3-307(1)(b) because this is the county in which one or more Defendants reside at the commencement of this action.

14.     Defendants Brad Bonham and Matt Davis are residents of Utah and are therefore subject to the general personal jurisdiction of this Court.

15.     Defendant MB & BB Holdings, LLC is subject to the general personal jurisdiction of this Court because it is a Utah limited liability company with its principal place of business in Utah.

16.     Collectively, Brad Bonham, MB & BB Holdings, LLC, and Matt Davis are referred to as the "**Founder Defendants**."

17.     Defendants Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., Damiano, Murphy, Suttin, Casella, and Fiorentino (collectively, the "**PHGP Defendants**" and with the Founder Defendants, the

4864-8601-9280.v1

"**Defendants**") are subject to personal jurisdiction in this Court pursuant to Utah Code § 78B-3-201 et seq.

18.    This case involves claims for more than $300,000 and therefore falls within Tier 3 of Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## THE PARTIES

### I.    PLAINTIFF BLUE OWL.

19.    Blue Owl is a Maryland corporation, with its principal place of business at 399 Park Avenue, New York, New York.  Blue Owl is the Administrative Agent and a Lender under the Loan Agreement dated March 31, 2021.  Blue Owl has continuously been a lender and creditor to the Company since shortly before the challenged dividend and remains a current lender and creditor to the Company.  Blue Owl, and the Lenders who have assigned their claims to Blue Owl, are currently owed over $160 million by the Company.

### II.    DEFENDANTS.

20.    Brad Edison Bonham is the former Chief Executive Officer and co-owner of Walker Edison, as well as a member of the board that controlled Walker Edison at all times relevant to this Complaint ("**Board**").  On information and belief, he resides in Salt Lake City, Utah.

21.    MB & BB Holdings, LLC is a Utah limited liability company with its principal place of business at 4350 West 2100 South, Suite A, Salt Lake City, Utah.  On information and belief, Defendant Brad Bonham owns, manages, and is a member of MB & BB Holdings, and Defendant Bonham directly or indirectly benefited from MB & BB Holdings' receipt of its portion of the Dividend.

22.     Matthew Brown Davis is the former Chief Operating Officer and co-owner of Walker Edison, as well as a member of the Board that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides in Salt Lake City, Utah.

23.     Walker Edison Holding Company, LLC ("**Walker Edison Holding**") is a Delaware limited liability company.  On information and belief, its principal place of business is in West Jordan, Utah.

24.     Prospect Hill Growth Partners, L.P. ("**Prospect Hill**") is a Delaware limited partnership, with its principal place of business at 500 Totten Pond Road, 6th Floor, Waltham, Massachusetts.

25.     JWC-WE Holdco, LLC is a Delaware limited liability company.  On information and belief, its principal place of business is in Waltham, Massachusetts.  On information and belief, it is an entity owned and/or controlled by Prospect Hill.

26.     JWC-WE Holdings, L.P. is a Delaware limited partnership.  On information and belief, its principal place of business is in Waltham, Massachusetts.  On information and belief, it is an entity owned and/or controlled by Prospect Hill.

27.     Prospect Hill Growth Fund II, L.P. is a Delaware limited partnership.  On information and belief, its principal place of business is in Waltham, Massachusetts.  On information and belief, it is an entity owned and/or controlled by Prospect Hill.

28.     Prospect Hill Growth Fund II Co-Invest, L.P. is a Delaware limited partnership.  On information and belief, its principal place of business is in Waltham, Massachusetts.  On information and belief, it is an entity owned and/or controlled by Prospect Hill.

29.     Phil Damiano is an Operating Partner at Prospect Hill and was the non-executive chairman of the Board that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides in or around Waltham, Massachusetts.

30.     Ken Murphy is CEO of a Prospect Hill portfolio company and a member of the Board that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides in or around Philadelphia, Pennsylvania.

31.     Adam Suttin is Managing Partner of Prospect Hill and was a member of the Board that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides in or around Newton, Massachusetts.

32.     Kyle Casella is a Principal at Prospect Hill and was a member of the Board that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides in or around Boston, Massachusetts.

33.     David Fiorentino is a former Partner at Prospect Hill and was a member of the Board that controlled Walker Edison at all times relevant to this Complaint.  On information and belief, he resides in or around Winchester, Massachusetts.

34.     Does 1 through 100 are individuals who received unlawful distributions or transfers or participated in some manner in the events described in this Complaint and therefore proximately caused or are otherwise liable for the injuries and damages that this Complaint describes.  The true names and capacities of Does 1 through 100 are not now known to Blue Owl, who therefore sues these Defendants by fictitious names.  Blue Owl will amend this Complaint to show their true names and capacities as it learns this information.

## FACTUAL ALLEGATIONS

### III.    WALKER EDISON'S BUSINESS AND ORGANIZATION.

#### A.    Operations.

35.    Walker Edison is a supplier of affordable, ready-to-assemble home furnishing products through e-commerce channels to consumers worldwide. Defendants Brad Bonham and Matthew Davis founded the Company in or around 2006. Defendant Bonham served as Walker Edison's Chief Executive Officer until June 2022 and served on the Board that controlled Walker Edison until the Company changed owners in 2023. Defendant Davis served as Walker Edison's Chief Operating Officer until April 2022 and continued to serve on the Board that controlled Walker Edison until the Company changed owners in 2023. In the years leading up to 2020, Walker Edison was a profitable company with an impressive track record.

36.    Unlike traditional brick-and-mortar furniture stores, at all relevant times Walker Edison operated exclusively through e-commerce channels, in which orders are placed on platforms such as Wayfair and Amazon. The vast majority of its products are shipped from Walker Edison's manufacturing suppliers in Asia and South America to the Company's own distribution centers or to the distribution centers of its e-commerce channel partners. From these distribution centers, orders are then drop-shipped directly to consumers.

37.    In order to meet customer demands for prompt delivery, Walker Edison must carefully manage its network of distribution centers and maintain a sophisticated inventory management system and a dedicated logistics team. E-commerce platforms therefore monitor the performance of suppliers like Walker Edison to ensure prompt and satisfactory deliveries to consumers. If Walker Edison fails to meet expectations, its listings on e-commerce platforms will

12

drop lower in the platform's search results, which reduces the visibility of Walker Edison's products and negatively impacts sales.

### B.    Corporate Structure.

38.    Walker Edison is, and has been at all times relevant to this Complaint, fully owned by Walker Edison Intermediate, LLC ("**Walker Edison Intermediate**").  In turn, during the relevant period, Walker Edison Intermediate was fully owned by Defendant Walker Edison Holding.  On information and belief, at all relevant times, the Board for Walker Edison Holding controlled all material decisions of Walker Edison Intermediate and Walker Edison.  On information and belief, at all relevant times, the Board was controlled and dominated by Defendants Davis, Bonham, and Prospect Hill and its representatives, including Defendants Damiano, Murphy, Suttin, Casella, and Fiorentino, all of whom represented the ownership group of Walker Edison at the time of the events relevant to the Plaintiff's claims alleged herein.  On information and belief, the Board did not have a single independent director, and was comprised solely of insiders.

### C.    Prospect Hill and the Founder Defendants Owned and Controlled Walker Edison.

39.    Prior to September 2018, Walker Edison was jointly owned by the Founder Defendants and a California-based private equity and mezzanine debt provider.

40.    In or around September 2018, the PHGP Defendants, comprising a Massachusetts-based private equity firm and family of funds now known as Prospect Hill, but then known as J.W. Childs Associates, acquired an approximately 55% majority share of the Utah-based Company from the Founder Defendants and the California-based firm, with the Founder Defendants retaining a 45% ownership interest.

4864-8601-9280.v1

41.    Prospect Hill is a private equity investor that has invested over \$2.8 billion in 37 portfolio companies.

42.    Following Prospect Hill's 2018 investment, Defendant Brad Bonham continued to serve as CEO, and Defendant Matt Davis continued to serve as COO at the Company's headquarters in Utah.  Both Defendants Bonham and Davis also continued to serve on the Board. Upon acquiring a majority share of the Company, Prospect Hill added its own Board members, including non-executive chairman Defendant Damiano (Operating Partner at Prospect Hill), Defendant Murphy (CEO of a Prospect Hill portfolio company), Defendant Suttin (Managing Partner of Prospect Hill), Defendant Casella (then-Vice President and now Principal at Prospect Hill), and Defendant Fiorentino (then-Partner at Prospect Hill).  Defendants Bonham, Davis, Damiano, Murphy, Suttin, Casella, and Fiorentino (collectively, the "**Board Defendants**") comprised the Board that governed Walker Edison at all times relevant to this Complaint.  On information and belief, there were no independent directors between September 2018 and early 2023.

## IV.    DEFENDANTS FALSELY PORTRAYED WALKER EDISON'S FINANCIAL HEALTH TO ATTRACT FINANCING FOR A MASSIVE DIVIDEND.

### A.    Defendants Sought to Cash Out of the Business Following a Period of Explosive Growth.

43.    The Company experienced significant growth in the years leading up to and including portions of 2020 amid the COVID-19 pandemic.  During that period, e-commerce furniture sellers experienced increased sales growth as brick-and-mortar competitors shut their doors while consumer demand rose as people were forced to spend more time at home.  Industry-

wide, the share of all furniture sales conducted online grew from only 21% pre-COVID-19 to 71% of all furniture sales during the peak of the COVID-19 pandemic from March 19 to May 20, 2020.

44.　　Walker Edison benefited from the significant and immediate growth in the online furniture industry.  From 2017 to 2020, Walker Edison saw EBITDA grow from $13 million to $84 million.  EBITDA stands for earnings before interest, taxes, depreciation, and amortization. It is one of the most widely used measures of a company's overall financial performance.  And while such growth peaked during the pandemic, online furniture sales overall remained above pre-pandemic levels even after brick-and-mortar competitors began to reopen.

45.　　In at least as early as 2020, seeking to capitalize on this explosive growth, the existing Walker Edison shareholders—Defendants Bonham, Davis, and Prospect Hill—decided it was the right time to launch an effort to extract cash from the business for themselves.  On information and belief, in order to finance their desired payout, Defendants considered a number of options to allow them to monetize their ownership in the Company, including an acquisition by a SPAC, a large equity investment, or a debt financing.  After failing to sell the business or complete a SPAC transaction, Defendants settled on a strategy to finance their payout through a dividend recap transaction.

46.　　The dividend recap transaction required the Company to incur $300 million of additional debt (the "**New Secured Loan**") in order to both clear out existing term loan debt and fund the approximately $210 million Dividend to themselves.  Without the loan, Defendants could not have paid such a large dividend to themselves, and with the loan, the Company's debt load would increase tremendously (without the capital to pay debt service as a result of the Dividend and the Company's dire but concealed financial circumstances).  Defendants began soliciting

potential lenders on behalf of the Company in or around March 2021.  On information and belief, the efforts to fund this dividend recap were led by Defendants Bonham, Davis, and representatives of Defendant Prospect Hill, including Defendants Fiorentino, Damiano, Casella, and others.

### B.    The Company Began to Experience Financial Distress before Defendants Received the Dividend.

47.    In late 2020, while Defendants were strategizing on ways to fund their payout, Walker Edison management discovered that overseas freight and shipping costs had been skyrocketing due to pandemic-related supply chain issues and that the Company's accrual accounting method had been inappropriately understating freight costs.

48.    From March 2020 to March 2021, the cost of a single ocean freight container used to transport Walker Edison's products from its overseas manufacturers nearly tripled, rising from approximately $2,600 to $7,300, with management anticipating that elevated ocean freight rates would persist.

49.    Not later than October 2020, Defendants knew that the Company's ocean freight and shipping expenses were rising rapidly and that their accounting methods were not accurately reflecting real-time increases.  On October 9, 2020, for example, the Company's Controller notified the CFO that in working on the month-end closing process for the Company's financial statements, he had noticed an "area of significant concern" relating to a substantial increase in ocean freight and shipping expenses that he could not explain, including that the cost of shipping had grown 57% since the previous month, and that was five times higher than the previous January. The CFO reviewed the income statement figures and replied "my biggest concern is the shipping expenses.  Would really like to know what's going on there.  Seems like maybe the cost allocations for capitalizing freight are being understated potentially?"  In fact, the Company's accounting at

the time was significantly understating freight costs in violation of Generally Accepted Accounting Principles ("**GAAP**") due to a failure to reconcile actual freight costs with capitalized prepaid costs.  The Founder Defendants and the PHGP Defendants were notified of this accounting problem between late 2020 and February 2021 and failed to remediate or disclose it prior to the Dividend.

50.    A few days after the October 9 communication, Defendant Bonham spoke with the Company's CFO, who told him that the Company had seen an $800,000 increase in shipping charges from the prior month, "but no revenue offset of that expense which we would expect to see."  A month later, on November 11, the CFO told Defendants Bonham and Davis that shipping charges continued to rise month-over-month and that the Company would miss budgeted EBITDA in part because "we are getting killed by FedEx peak season charges."

51.    Almost immediately, the Founder Defendants began discussing the precipitous increases in shipping and ocean freight expenses affecting the Company with the PHGP Defendants.  The Founder Defendants and PHGP Defendants were well aware of the risk to the Company's forecasted performance posed by freight and shipping price increases and the impact it would have on the Company's ability to meet its forecast.  On October 15, 2020, Defendant Fiorentino recounted that the PHGP Defendants had been told in a management presentation that ocean freight costs were "way up" and advised that "[a]t the least, we should calculate the hit we have taken vs. last year," noting that Defendant Davis would be following up with information on this point.

52.    Defendants understood the serious problem posed by rising freight and shipping charges (and the Company's improper understatement of freight charges in its financial

statements) by not later than December 2020, and they quickly realized that it could spook potential investors and therefore jeopardize their desired payout. Accordingly, the Founder Defendants and PHGP Defendants discussed the need to suppress mention of these issues in Company promotional materials.

- On December 2, 2020, Defendants Fiorentino, Casella, and Damiano were told that "[freight] rates are increasing all over the map due to capacity limitations." Defendant Fiorentino then told Defendants Casella and Damiano that he had hoped the ocean freight market would improve but that "doesn't seem to be the case."

- On December 8, 2020, a PHGP representative told the Founder Defendants that "[we] thought not ideal to call out ocean freight at this point as the market dynamics are still fluctuating and we might not want buyers scrutinizing this." (Emphasis added).

- Two weeks later, Defendant Fiorentino reinforced his concern about highlighting freight prices to buyers, saying "I don't think we want to open the ocean freight can of worms."

- On December 21, a Walker Edison employee sent an email to Defendant Fiorentino noting concerns about an "increase in ocean freight charges" and stating that, upon discussions with Defendant Casella and Defendant Fiorentino, they had concluded that "there doesn't seem to be relief on the horizon and forecasts for the future rates are up in the air." Defendant Bonham relayed similar comments to Defendants Damiano and Casella, stating "everyone knows ocean freight isn't abating anytime soon."

- On information and belief, Defendants continued to investigate, monitor, and discuss the increased freight and shipping costs—and the Company's failure to properly account for freight costs—over the next two months, including during the Company's closing of its year-end financial statements in February 2021, when the Company again confirmed that there were, in fact, significant errors with the Company's freight accounting that had the effect of understating freight expenses and materially overstating gross profit and EBITDA.

53.    By early March 2021, Defendants knew that the Company's financial statements—which understated costs and thereby overstated EBITDA, profit margins, and net income—did not reflect the Company's true financial position, and that Blue Owl and the other Lenders were relying on those financial statements in deciding whether to extend a $300 million term loan to the Company.  But Defendants chose not to rectify the accounting misstatements until after the closing of the New Secured Loan.

54.    Rising freight and shipping costs and delays were not the only problem that the Company was beginning to face.  The same supply chain disruptions that were causing increased freight and shipping costs were also causing a spike in Walker Edison's out-of-stock rates and on-time delivery rates, both of which directly impact Walker Edison's sales.  High out-of-stock rates lead to lost revenue because Walker Edison cannot sell what it does not have.  And both high out-of-stock rates and low on-time delivery rates negatively impact a seller's relationship with e-commerce platforms and can cause their listings to appear lower in the platform's search results.  As Defendant Bonham acknowledged in February 2021, "[i]nventory seems like it underperforms every month," leading to "[m]issing $40 million in revenue from the last four months."

4864-8601-9280.v1

55.     By December 2020, shipping delays had become so pronounced that they caused one of Walker Edison's largest e-commerce platform customers to shut off the Company's sales on the platform entirely for much of the month of December as punishment, causing the loss of millions of dollars in revenue.  Referring to the negative impacts on the Company's performance caused by the shipping problems, Defendant Bonham told Defendant Davis and his management team, "I expect all of us to ask ourselves how did we [expletive] December this badly . . . if we don't take drastic action right now, we can kiss January goodbye as well."  In combination, these problems were also creating significant cash flow problems for the Company.

56.     Defendants knew that problems were mounting with their out-of-stock and on-time delivery rates, which would cause problems down the road prior to Defendants paying themselves the Dividend.  But as with freight expenses, Defendants caused to be prepared, prepared, and reported financial information that did not reflect the realities that the business was facing.

57.     All of these issues, among others, meant that Defendants knew that the financial projections did not properly reflect the Company's circumstances prior to the issuance of the Dividend.  Defendants knew that the Company's cash flow challenges would worsen as a result of the significant headwinds impacting the business and that the Company would be undercapitalized and unable to pay debts as they came due.  And that is exactly what happened.  As subsequent months played out, and as a result of these known circumstances, the Company did in fact hemorrhage cash to such an extent that it faced challenges in funding ongoing operations.

**C.      Defendants Fraudulently Portrayed a Financially Healthy Company When Walker Edison Was Actually in Crisis.**

58.     To induce Blue Owl and the other Lenders to enter into a loan agreement (the "**Loan Agreement**") and fund the $300 million New Secured Loan, and to justify taking the

Dividend out of the Company despite the imminent cash flow problems that Defendants knew were on the horizon, Defendants disclosed to Blue Owl and the other Lenders erroneous financial data through February 2021 and projections that they knew were not reasonable or realistic under the circumstances.  Defendants represented in forecasts that the Company's explosive growth— including the "bump" in sales that the Company and industry experienced during the first year of the COVID-19 pandemic—would continue without disruption.  In other words, Defendants premised their efforts to solicit $300 million in the New Secured Loan on (a) knowingly unwarranted assumptions that the Company would continue the substantial growth it experienced as a result of the COVID-19 pandemic; and (b) fraudulent projections that they knew falsely misrepresented and omitted the material impact of increased freight, shipping, and other costs, all of which negatively impacted profitability, liquidity, and the Company's ability to pay its debts as they became due.

59.     The reality was that Defendants knew by no later than early March 2021 that the Company was experiencing decreased profits and sales, increased expenses, and a substantial liquidity shortage.  Undeterred in their mission to gain financing in order to extract the Dividend from the Company, Defendants knowingly provided materially false, misleading, and inaccurate information to induce Blue Owl and the other Lenders into providing the New Secured Loan.

60.     On March 10, 2021, the PHGP Defendants, led by Defendant Fiorentino, reached out to principals at Blue Owl about a potential investment in Walker Edison.  On March 11, 2021, Defendant Casella had an introductory call with a Blue Owl representative regarding this investment.

61.     On March 13, 2021, following the introductory call, Defendant Casella sent a financial model that captured both historical and estimated future modeling for Walker Edison (the "**Financial Projections**").  The PHGP Defendants and Founder Defendants (among others) prepared and approved the Financial Projections and, upon information and belief, authorized Defendant Casella to send the financial projection to Blue Owl.  The Financial Projections were relied upon by Blue Owl in its evaluation of the Walker Edison transaction.  But the Financial Projections contained multiple material misrepresentations or omissions and Defendants had full knowledge of these material inaccuracies.

62.     More specifically, the Financial Projections that Defendant Casella sent to Blue Owl and the other Lenders in March 2021 contemplated that Walker Edison would continue its earlier strong performance despite known and knowable facts to the contrary.  The fraudulent projections included the below.

- Cost of Goods Sold:  Despite months of increased costs, including the increasing ocean freight costs, Defendants projected the same Costs of Good Sold as a percentage of net sales for 2021 through 2025 as they had in earlier projections as of November 2020.

- Cost of Shipping:  Despite awareness of rapidly spiraling shipping costs for at least five months prior, Defendants also projected the same Cost of Shipping as a percentage of net sales for 2021 as they had in earlier projections.

- Gross Profit:  Defendants projected increased gross profit of $197.2 million in 2021, which was higher than the Company's last-twelve-month ("**LTM**") gross profit of $146.5 million.

- <u>Reported EBITDA</u>:  Defendants projected reported EBITDA of $104.4 million for 2021. Because the Financial Projections understated increased costs, they overstated EBITDA growth.

- <u>Adjusted EBITDA</u>:  Defendants projected adjusted EBITDA of $111.6 million for 2021. Adjusted EBITDA is a measure of EBITDA that adds back into EBITDA what the Company considers to be nonrecurring or one-time expense items.  Because the Financial Projections understated the known higher costs that were recurring, they overstated Adjusted EBITDA growth.

63.     The next day, March 14, the PHGP Defendants, including Defendant Casella, participated in a sponsor diligence call with Blue Owl.  During that call, Defendant Casella, on behalf of the PHGP and Founder Defendants and consistent with the Financial Projections, falsely represented that they were confident that EBITDA would continue to demonstrate strong growth in 2021.  Defendants were aware of, and authorized and aided, Defendant Casella's false statements despite all Defendants' contemporaneous knowledge that there was no reasonable basis to project EBITDA and profitability growth under the Company's then-current circumstances. These circumstances, as reflected in meetings, discussions, and communications among the Defendants, included rapidly spiraling freight and shipping costs and internal assessments from the Company's management that reduced profitability and an EBITDA decline was likely, as alleged below and herein.  Despite Defendants' awareness by this time that the Company would be forced to short pay its vendors in order to avoid running out of liquidity, Defendant Casella did not disclose this serious situation but instead misrepresented Walker Edison's position by

emphasizing its purported success due to quick sourcing from vendors.  None of the Defendants ever corrected the material omissions and misrepresentations in the Financial Projections.

64.    On March 16, Defendant Casella, with the knowledge and authorization of all Defendants, sent further data to Blue Owl, including actual financial data through February 2021 (the "**Original Actuals**").  Blue Owl and the other Lenders justifiably relied upon the Original Actuals in deciding whether to extend the $300 million loan to the Company.  And as stated above, at the time the Original Actuals were transmitted to Blue Owl, Walker Edison management, the Founder Defendants, and the PHGP Defendants were all aware of a material accounting error that adversely impacted Walker Edison's historical financial performance as reflected in the Original Actuals, rendering them materially false and fraudulent as to, among other things, Walker Edison's gross profit, gross margin, EBITDA, and EBITDA margin.  Specifically, the financial statements provided to Blue Owl failed to account for material freight expenses the Company had already incurred, thus causing the Company to appear significantly more profitable than it actually was and causing the fraudulent Financial Projections to appear more reasonable.  The Original Actuals misrepresented all of these figures due to its reliance on the known accounting errors.  These accounting errors resulted in an actual EBITDA that was $6.6 million lower than represented in the October 2020 to February 2021 financial information provided to, and relied on by, Blue Owl.

65.    Despite knowledge of these accounting errors that rendered the Original Actuals, Financial Projections, and other financial data presented materially false and misleading, Defendants Bonham, Davis, and the other Defendant Board members never notified Blue Owl of this material discrepancy or alerted Blue Owl that the financial statements or projections themselves were materially false and misleading and should not be relied upon before the Loan

Agreement closed.  Once Walker Edison's CFO further confirmed the accounting errors no later than February 2021 and before the closing of the New Secured Loan, Walker Edison's CFO immediately notified Defendants Bonham and Davis about the material accounting error.  Walker Edison's CFO, Defendant Bonham, and Defendant Davis thereafter promptly raised this issue with the rest of the Board members.  Had Defendants disclosed that the financial results materially understated freight costs, Blue Owl and the other Lenders would also have been in a position to conclude that the Financial Projections and other projections were completely unrealistic and inaccurate.  Defendants' fraud prevented this from happening.

66.    To the contrary, Defendants continued to knowingly present a materially false and misleading picture of the Company's financial situation.  In addition to the March 14 call described above wherein Defendants made numerous material misrepresentations and omissions, Blue Owl also met with Defendants and Walker Edison's CFO on March 19, during which discussion Blue Owl was told, with Defendants' authorization and awareness, that the Company would be shocked if 2021 growth was even as low as the Financial Projections, and that internally Walker Edison had a higher target, an expression of optimism that Defendants knew was materially false and misleading for all the reasons alleged herein, and that echoed Defendant Casella's false statements on March 14.

67.    Blue Owl and the other Lenders justifiably relied upon these financial statements and projections and statements that Defendants made about them in connection with entering into the Loan Agreement and funding the New Secured Loan.  On information and belief, Defendants decided not to correct these misstatements because correcting the accounting information and modifying the projections to reflect known facts could impair Defendants' chances of achieving a

large payday through a new equity investment or dividend recap transaction.  In reliance on the Original Actuals and the Financial Projections, Blue Owl and the other Lenders agreed to enter into the Loan Agreement and fund the New Secured Loan to their detriment.

68.     But before Defendants presented these rosy and false assessments of the Company's financial position and prospects to Blue Owl and the other Lenders throughout March 2021, Defendants had already been made aware of Company management's decidedly pessimistic assessment of the Company's financial position that made Defendants' statements materially false and fraudulent.  Defendants discussed and accepted these negative assessments, none of which were disclosed to Blue Owl and the other Lenders.  When these internal and external statements are compared, they make clear that Defendants' fraud was not accidental but was intentional and motivated by financial gain.

69.     On March 9, 2021, for example, Walker Edison's President told Defendants Bonham and Davis that "FedEx fees will continue to increase and raw material costs may also increase."  Further, on March 11, 2021—approximately three weeks before closing the new $300 million loan and causing the Dividend to be issued—Defendant Bonham told Defendant Davis and other Walker Edison employees that they "just had a meeting with the P[rospect] H[ill] guys," where the Company's CFO "shared <u>an erosion happening in our profit profile due to inbound freight and outbound increased FedEx charges</u>."  (Emphasis added).  On the same day, the CFO warned Defendants Bonham and Davis that "I know we 'think' we will see relief in May or June on the ocean freight, but I wouldn't count on it and I'm really worried about the raw materials market."  There was no disagreement from Defendant Bonham, who, in another email, expressly stated that he did not "see ocean freight or fedex costs reverting."

70.    That day, unbeknownst to Blue Owl and the other Lenders, tempers were flaring inside the Company as Defendants tried to deal with the Company's financial woes.  On March 11, 2021, the Company's Controller put it bluntly:  "cash is short right now."  On the same day, Defendants had attended a meeting to discuss the Company's "recent underperformance."  The Company's President expressed regrets that "the meeting did not go well and could have been better managed," alluding to Defendants' frustration with the management team that had brought them more bad news without providing any reassurance.  The Company's President then provided the Founder Defendants and PHGP Defendants a summary of next steps that were necessary to address the Company's "reduced profitability, increased costs, and the impact on the FY21 EBITDA forecast."

71.    Two days later, Defendants presented Blue Owl and the other Lenders with the Financial Projections showing freight and shipping costs remaining stable and the Company gaining dramatically increased EBITDA and profit margins throughout 2021.  Thus, despite receiving all of this alarmingly bad news on March 11, 2021 regarding the Company's "reduced profitability," "underperformance," the "impact on the FY21 EBITDA forecast," and the "erosion happening in our profit profile due to inbound freight and outbound increased FedEx charges," the Founder and PHGP Defendants just two days later presented Blue Owl with a misleadingly bullish picture of the Company's prospects, providing the false and misleading Financial Projections that reflected increased gross profit and EBITDA for 2021 and assumed no significant increase in cost of goods sold due to freight charges and no significant increase in cost of shipping.  These projections were completely at odds with material undisclosed facts of which Defendants were already aware.  The very next day, on March 14, 2021, Defendant Casella and the other Defendants

reinforced this unwarranted optimism, misrepresenting to Blue Owl that Defendants were "very confident" the Company's EBITDA performance would be "bigger this year."

72.    On March 16, 2021, just two days after communicating the falsely positive outlook to Blue Owl on March 14, Defendant Fiorentino privately wrote to Defendants Bonham, Davis, Casella, and Damiano that there were "very high hurdles for gross margin/EBITDA year over year starting in April."

73.    On March 19, Blue Owl met with Defendants and the Company CFO and was told that the Company would be shocked if 2021 growth was even as low as the Financial Projections, and that internally Walker Edison had a higher target, an expression of optimism that Defendants knew was materially false and misleading, and that echoed Defendant Casella's false statements on March 14.

74.    The highly material negative information was ***never*** disclosed to Blue Owl or the other Lenders; in fact, the opposite was conveyed by Defendants through their statements to Blue Owl and the other Lenders, and through the distribution of false and misleading financial statements and projections for the Company.  These material facts and others were not disclosed because, as Defendant Fiorentino put it, the focus was still on a "dividend path to private deal," meaning the Dividend following the closing of the New Secured Loan.

75.    As the days passed, other management-level employees shared concerns that the Company would continue to suffer from spiraling freight costs well beyond March 2021.  On March 19, 2021, the very same day that Blue Owl was being told that the Company's performance had been outstanding and was expected to be higher than the Financial Projections, a Company vice president complained internally that "ocean freight increases will be persistent," and that the

increasing freight costs plaguing the Company and the global supply chain would not be "short term/temp."  The Company's Treasurer told the CFO that "it seems like [freight expenses] ha[ve] been going up every month since the first of the year."  On information and belief, the Founder Defendants and PHGP Defendants began holding "all hands" meetings to discuss how to handle the soaring freight and shipping costs, which were quickly burning up the Company's cash resources and were making the Company's financial position untenable.  Defendants never even told Blue Owl and the other Lenders about the remarkable fact, as alleged above, that ongoing shipping problems had recently disrupted one of its most significant customer relationships in December 2020 when the Company was kicked off of the customer's e-commerce platform as punishment for delays, an event that caused Defendant Bonham to say, "I expect all of us to ask ourselves how did we [expletive] December this badly."  Again, none of these material facts were disclosed to Plaintiff and the other Lenders.

76.    Despite these regular internal discussions, the Company's projections that Defendants used to justify and support the incurrence of the Loan Agreement and New Secured Loan did not reflect Defendants' actual knowledge that the Company would continue to suffer from increased freight and shipping costs and that costs would continue to increase after consummation of the transaction.  In fact, Defendants knew that the projections they used to promote and justify the Loan Agreement and New Secured Loan failed to account for the increased freight and shipping expenses the Company had encountered since at least as early as October 2020 and failed to account for the resulting erosion in EBITDA that Defendants knew would continue to occur.  Defendants did not even properly account for the EBITDA misses that they knew had already resulted from these issues and other performance challenges.  Moreover,

Defendants were well aware that the Company's financial projections were unreasonably high and ignored reality in order to justify the Dividend.  Walker Edison's own President lamented weeks after the Dividend was issued that "we were saying from the beginning that the forecast for this year was way too high and no one listened."

77.    To the contrary, Defendants sought to downplay the Company's margin, profitability, and liquidity problems as potential issues.  At the same time that Defendants and Walker Edison management were internally discussing the "persistent" and "inevitable" increases in freight and shipping costs and the "erosion in our profit profile"—as Defendant Bonham put it—caused by those increases that were not accounted for in the Financial Projections, Defendants were telling prospective lenders that freight and shipping issues had been resolved.

78.    For example, in the March 3, 2021 memorandum titled "Confidential Information Memorandum – Public Lender Information" (the "**March 2021 Confidential Memo**") and given by the Board Defendants to Blue Owl and the other Lenders in March 2021, Defendants told Plaintiff and the Lenders that although Walker Edison had "experienced unprecedented supply chain challenges" in November 2020, it "has since worked through the supply chain challenges, which no longer pose an issue" and that "[t]he Company's January 2021 performance recovered well from December 2020, as the supply chain challenges subsided and Walker Edison continued to experience increased demand."  Upon information and belief, the Board Defendants—who constituted the entire Board and several key leadership positions—caused or approved this false representation to be placed in the March 2021 Confidential Memo, which itself "represent[ed] and warrant[ed] . . . that the information contained in [the March 2021 Confidential Memo] . . . does not contain any untrue statement of a material fact or omit to state a material fact necessary to

make the statements contained herein not materially misleading in light of the circumstances under which such statements are made."

79.    These materially false and misleading statements came at the same time that Defendant Bonham was telling management internally, "I don't see ocean freight or fedex costs reverting" and the Company's president was warning Bonham, Davis, and the PHGP Defendants of "reduced profitability, increased costs, and the impact on the FY21 EBITDA forecast."   In addition, on March 22 and 24, 2021, just days before closing the New Secured Loan, employees of Walker Edison were still grappling with the related errors with the Company's freight accounting, noting that there had been "$6.4 million of freight costs" that were "not being allocated to inventory timely," which had been known since year-end 2020.  Again, this was never conveyed to Blue Owl or the other Lenders prior to closing of the New Secured Loan, despite Defendants' knowledge.

80.    As problems mounted, the Company was forced to take drastic steps to deal with its lack of liquidity to pay ongoing debts due to its deteriorating financial condition.   On information and belief, not later than March 2021, the Company started to discuss intentionally short paying invoices to certain critical vendors, *i.e.*, paying less than the invoiced amount due and delaying payment, to manage its cash liquidity.  While helpful on paper to slow cash burn, this strategy of underpaying and delaying critical vendor payments would cause material risk to the Company's relationships and business going forward.  Delaying and short paying critical vendor payables was not part of the Company's regular and normal working capital management. Defendants made this intentional decision because the Company would be running precariously low on money soon without such a strategy, and the Company modeled various percentages of

vendor short paying so that it could preserve liquidity and remain in compliance under its asset-based loan facility ("**ABL Facility**").  Yet, when cash did become available through the Loan Agreement, Defendants did not leave a single dollar of cash in the Company and rather siphoned off the cash for their own benefit through the Dividend.

81.     The Founder Defendants and PHGP Defendants were fully aware of the liquidity crisis faced by the Company and were advised of various measures Company management was proposing to deal with the Company's growing inability to pay its debts.  Between March 3 and 8, 2021, for example, the Company's CFO requested that a four-week cash flow forecast be drawn up showing that the Company would only be able to pay 86% of what it was scheduled to pay to its suppliers in China and Brazil and stated that he was "going to talk to [Defendant Bonham], [Walker Edison's President], and [Defendant Davis] today about pushing orders out," *i.e.*, delaying critical orders from suppliers, "since we aren't hitting sales goals."  According to an internal cash flow forecast dated March 16, 2021, the Company had determined that it could not pay its debts to vendors and suppliers as they came due without running out of availability on its bank line of credit and being in breach of its credit requirements within five weeks.

82.     As of at least March 17, 2021, management expressed concern that the Company's factory relationships—absolutely essential to the Company's business and survival—could be seriously jeopardized if the Company stretched payments beyond due dates and short paid for orders that it had placed.  They also debated which part of the Company was better positioned to "weather this storm."

83.     Defendant Bonham also started pushing the idea of slashing hiring at the Company given the dire financial conditions, telling Defendant Davis and others on the management team,

"revenue miss plus increasing expenses = stop hiring." However, this formula did not stop Defendants from, just days later at the end of March 2021, causing the Company to incur $300 million via the New Secured Loan (resulting in increased debt service costs) or funding an approximately $210 million distribution to line their own pockets. And as Walker Edison's CFO told Defendants Bonham and Davis, a hiring freeze would not resolve the financial problems alone, and other factors like costs of goods and shipping costs "are the more significant drive[r]s of future performance."

84.    By March 16, 2021—the same day Defendants provided Blue Owl and the other Lenders with the inflated Original Financials—the Company had completed an internal 16-week projection showing that in order to preserve capacity under its current $55 million ABL Facility— the Company's key source of liquidity—the Company would only be able to pay a portion of invoices owed to suppliers for the two weeks preceding the Dividend and through at least June 2021.

85.    Two days later, on March 18, the Company had completed another internal projection showing that it would exceed its borrowing capacity under its ABL by May 2021. It also showed that the Company would burn through more than $100 million in cash—which it did not have—by December 2021. Upon information and belief, Defendants were aware of these projections that reaffirmed the on-the-ground reality yet failed to disclose this information to the Lenders.

86.    On March 18, the day before Defendants communicated to Blue Owl and the other Lenders that 2021 growth was expected to surpass even current expectations, the Company's President advised Defendants Bonham, Davis, Fiorentino, Damiano, and Casella as members of

the Walker Edison Board that the Company should delay certain critical hiring and implement a 31% reduction in hiring of non-critical roles "immediately" and not reintroduce non-critical hiring until "performance improves." These discussions and others alleged herein reflect that all of the Defendants were fully aware and in regular communication regarding the Company's lack of adequate capital and inability to pay its debts as they came due while they continued to plan the consummation of the dividend recap transaction.

87.     The Company's actual performance with respect to freight and shipping delays and increased costs not only impacted its cash liquidity in the form of reduced profits, but it also reduced the Company's ability to access the bank borrowing that was essential for it to meet its debts. Specifically, the freight and shipping issues had an immediate impact on the Company's ability to borrow cash under its ABL Facility. In connection with incurrence of the debt financing, on March 31, 2021, the ABL Facility was also amended to increase the available loan capacity from $55 million to $75 million. But the increased loan capacity did not mean that the Company was able to actually access that full capacity. Indeed, even prior to the amendment of the ABL Facility, the Company's ability to access the full capacity of the ABL was uncertain.

88.     On March 26, 2021—and consistent with the March 16 and 18 internal forecasts about the difficulties with retaining availability under the ABL Facility while continuing to pay the Company's obligations to its vendors and suppliers—the Company's CFO sent an email to representatives of Prospect Hill and to the Company's lender under the ABL Facility telling them that the Company's projections (which were used to justify the new loan and the issuance of the Dividend) depended on the Company having access to the full $75 million available under the ABL Facility, but that delays in shipments of the Company's inventory would preclude the

Company from borrowing the full amount it needed under the ABL Facility because the inventory necessary to supply the necessary collateral had been averaging in-transit times far beyond the lender's permitted 45-day time limits. Defendants ultimately declined to make a request to the ABL lender to increase the limits because Defendant Casella responded that he did not want such a request to "slow down the process," meaning the "process" by which Defendants were to cause Walker Edison within the next few days to incur $300 million in new debt so that Defendants could take the $210 million Dividend out of the Company. Again, Defendants did not disclose the Company's liquidity problems to Blue Owl or the other Lenders prior to the closing of the loan transaction.

### D. Defendants' Fraudulent Representations Caused the Lenders to Fund a $300 Million Term Loan and Caused the Company to Fund an Approximately $210 Million Dividend to Defendants.

89.     All of these issues, among others, meant that Defendants knew the Company, prior to closing on the New Secured Loan, was facing disruptions to its business that made its financial reporting and financial projections inaccurate and unreliable and would impact the Company's ability to pay debts as they came due. None of these facts caused Defendants to refrain from using their knowledge and control over Walker Edison to wrongfully (and fraudulently) induce Blue Owl and the other Lenders to enter into the Loan Agreement and provide $300 million in added funds in the form of the New Secured Loan, which Defendants knew Walker Edison could not repay.

Defendants Continue Their Fraud in the Loan Agreement

90.     In the Loan Agreement and in written and oral communications during the loan diligence process in March 2021, the Board Defendants made, and caused to be made, additional

numerous materially false and misleading representations and warranties to Blue Owl and the other Lenders. Defendants' misrepresentations in the Loan Agreement and elsewhere were belied by the facts on the ground that were known to Defendants but not to Blue Owl or the other Lenders. In addition to the oral and written misrepresentations and omissions made by Defendants as alleged herein, below is a description of certain further material misrepresentations and omissions made, and authorized to be made, by Defendants in the Loan Agreement itself.

91.    The Board Defendants caused the making of a representation in Section 3.04(a) of the Loan Agreement that historical financial statements were prepared in accordance with GAAP and presented fairly the financial condition of the Company and Section 3.13(a) provided that no written information, report, or financial statement furnished to the Lenders contained a material misstatement of fact. These representations were materially false because among other things, the Company's historical financial statements actually violated GAAP, materially misstated the Company's freight costs, costs of goods sold, gross margin, EBITDA, and other metrics, and had to be restated for 2018 and 2019 as a result of the 2020 audit completed in July 2021, and the October 2020 to February 2021 financial statements that had been provided to Blue Owl and the other Lenders had to be corrected.

92.    In Section 3.04(b), the Board Defendants caused the making of a representation that there had been no event, change, circumstance, or occurrence that was or was expected to be a material adverse effect. This representation was materially false because in reality, there continued to be materially adverse changes in the financial state of the Company—including reduced profitability, increased costs, and imminent inability to pay critical vendors—that rendered the

4864-8601-9280.v1

Company unable to pay its debts as they came due and lacking adequate capital through the date of the dividend recap transaction.

93.    In Section 3.13(b), the Board Defendants caused the making of a representation that any projections were prepared in good faith and "utilized only assumptions believed by it to be reasonable when made in light of the then current circumstances."  The Financial Projections delivered by Defendants to the Lenders were known by Defendants to be unreasonable and false in that the Financial Projections, among other things, projected a decrease in shipping and freight costs, even though the Board Defendants internally acknowledged they did not "see ocean freight or fedex costs reverting."  The Board Defendants likewise were aware of reduced profitability, increased costs, and the impact of those issues on the Company's forecasts.  The projections provided to Blue Owl and the other Lenders were therefore not made in good faith and did not utilize assumptions believed by Defendants to be reasonable when made in light of the then-current circumstances.

94.    In Section 3.15 (Solvency), the Board Defendants caused the making of a representation that as of the closing date, and after giving effect to the refinancing, Dividend, and payment of fees under the Loan Agreement, the Company "on a consolidated basis" would be solvent.  In reality, the Company was not solvent under any standard, as alleged herein.  Notably, the Company was already unable to pay ongoing debts, internal projections suggested the Company would soon exceed its borrowing capacity, and the Board Defendants recommended slashing critical hiring in order to deal with the lack of liquidity.

95.    The Loan Agreement further contained no provision disclaiming reliance by Blue Owl or the Lenders on any representations made by the Board Defendants either outside of the

Loan Agreement or inside it (in the form of the representations and warranties made).  In all respects, Plaintiff Blue Owl and the Lenders were legally entitled to, and did rely, on the material false representations and omissions by Defendants in connection with the Loan Agreement.

96.    Upon information and belief, Defendants—who constituted the governing board of, and substantially all of the equity ownership interests in, Walker Edison—made and caused to be made the material misrepresentations and omissions in the Loan Agreement and those otherwise communicated to Blue Owl and the other Lenders during the loan transaction diligence. Defendants knowingly made, and caused Walker Edison and its affiliates, employees, and representatives to make, these material misrepresentations and omissions, on which Blue Owl and the other Lenders reasonably and justifiably relied, in order to induce Blue Owl and the other Lenders to enter into the Loan Agreement, which allowed Defendants to extract hundreds of millions of dollars.

97.    Defendants controlled Walker Edison (both the Board and its top management positions).  The Founder Defendants and PHGP Defendants who served on the Walker Edison Board caused and authorized Walker Edison (through its corporate CFO) to sign the Loan Agreement on behalf of the relevant Walker Edison entities.  Corporate authorizations for the Loan Agreement confirm that Defendants knowingly caused, approved, authorized, and ratified the illegal acts and fraud in connection with the loan transaction and financially benefited thereby and are therefore liable for them.

98.    Because Defendants arranged and caused the Company, Walker Edison Intermediate, and another subsidiary (EW Furniture, LLC) to serve as the only borrower/guarantor signatories to the Loan Agreement, Defendants arranged to avoid having themselves serve as

signatories or parties to the Loan Agreement in order to further distance themselves from the fraud they had committed.  As a result, Defendants cannot avail themselves of or otherwise invoke any of the Loan Agreement's provisions (including the choice-of-law or venue provisions) in their defense, as the Loan Agreement expressly prohibits this.  Pursuant to Section 10.04(a), the Loan Agreement provides that "[n]othing in this Agreement or any other Loan Document . . . shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby . . . ) any legal or equitable right, remedy or claim under or by reason of this Agreement or any other Loan Document."

<u>Agency Allegations</u>

99.     In connection with the Loan Agreement, the Board Defendants caused to be created, executed, and delivered to Blue Owl and the other Lenders, in connection with an Omnibus Officer's Certificate dated March 31, 2021 (the same date as the signing and closing of the Loan Agreement), an Omnibus Written Consent by Defendant Walker Edison Holding Company LLC, the Utah-based entity owned and controlled by the Defendants:  (1) stating that Blue Owl and the other Lenders were entitled to rely upon the terms (including the materially false and misleading representations and omissions) of the executed Loan Agreement as having been authorized by Defendant Walker Edison Holding Company, LLC; (2) falsely representing that Walker Edison would not be rendered insolvent as a result of the Term Loan or transactions contemplated by the Term Loan guaranties (including the Dividend); and (3) stating that any acts by any manager, officer, employee, or agent of each Walker Edison affiliate in connection with the Term Loan transaction were "in all respects ratified, approved, confirmed, and adopted as acts and deeds by and on behalf of" Walker Edison Holding Company, LLC.

100.    Defendants, as members of the controlling board and equity owners (or their representatives) of Defendant Walker Edison Holding, Walker Edison Intermediate, and Walker Edison, knowingly caused, approved, authorized, and ratified the acts undertaken by Defendant Walker Edison Holding and the other companies (including Plaintiff Walker Edison, Walker Edison Intermediate, and EW Furniture LLC as borrowers/guarantors) and their affiliates, employees, and representatives, all of whom acted as Defendants' agents within the course and scope of such agency in connection with the Loan Agreement and acts and transactions relating thereto for Defendants' benefit.  Based on the facts alleged herein and to be proven at trial, Defendants are themselves liable for those acts directly and also vicariously as principals, and their acts and knowledge are thereby imputed to Defendants.

101.    In addition, each of the Board Defendants at all times acted on his own behalf and on behalf of the other entity Defendants that had the remaining direct or indirect ownership interests in Walker Edison.  Defendant Brad Bonham acted at all times alleged herein both in his own personal interest and as an authorized agent and representative of Defendant MB & BB Holdings, which was the Utah-based investment vehicle through which he held ownership in Walker Edison and whose interests were aligned with his own.  In undertaking the acts alleged herein, Defendant Bonham acted within the scope of his authority and agency to pursue the interests of Defendant MB & BB Holdings in causing the New Secured Loan and the Dividend, the proceeds of which were paid to MB & BB Holdings.  Defendants Damiano, Murphy, Suttin, Casella, and Fiorentino, who were all affiliated with Prospect Hill, acted at all times alleged herein both in their own individual personal interests and as authorized agents and representatives of Defendants Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings,

L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P. (collectively, the "Prospect Hill Entities"), which constituted the various Prospect Hill-related entities with direct or indirect ownership interests in Walker Edison and whose interests aligned with their own.  In undertaking the acts alleged herein, Defendants Damiano, Murphy, Suttin, Casella, and Fiorentino acted within the scope of their authority to pursue the interests of the Defendant Prospect Hill Entities in causing the New Secured Loan and the Dividend, the proceeds of which were paid to the Prospect Hill Entities.  In addition, all of the Board Defendants served as managers and directors of Defendant Walker Edison Holding Company, LLC, which controlled Walker Edison Intermediate and Walker Edison.  As a result of these relationships, each of the Board Defendants and Defendant Walker Edison Holding was an agent of the remaining Defendants and the conduct and knowledge of the Board Defendants and Walker Edison Holding LLC as alleged herein are imputed to the remaining Defendant entities, on whose behalf they acted within the scope of their authority and which are equally liable both directly and vicariously as principals.

Defendants Use the Loan Proceeds to Pay Themselves the $210 Million Dividend

102.    As explained above, the representations and warranties contained in the Loan Agreement and the related financial statements and projections and the omissions therefrom were materially false and misleading.  Defendants had exclusive and unique knowledge of the true material facts and information such that the exercise of reasonable diligence would not have uncovered the fraud, and Defendants fraudulently concealed, misrepresented, and omitted to disclose the true material facts in order to induce and cause Blue Owl and the other Lenders to

fund $300 million under the New Secured Loan, the majority of which went directly to Defendants' pockets.

103.    In reasonable reliance on the financial statements and projections prepared and provided by Defendants, as well as the representations and warranties in the Loan Agreement and Omnibus Written Consent, Blue Owl and the other Lenders executed the Loan Agreement on March 31, 2021. This transaction resulted in the New Secured Loan, which provided $294,921,250 in net cash for the Company. Defendants, however, did not permit the Company to retain a single dollar of the New Secured Loan to fund its ongoing operating costs or to solve the known liquidity issues. Rather, 100% of the proceeds of the New Secured Loan was used to pay transaction fees, to repay existing debt of $82,874,156.25, and to fund the Dividend and various employee profit interests of $209,320,503.41. The liens under the Loan Agreement on the Company's cash were not perfected prior to the Dividend (which was paid on the same day), and the funds used for the Dividend were not fully encumbered by valid liens when transferred from the Company's accounts.

104.    Defendants also caused the Company to increase its loan capacity under the ABL Facility from $55 million to $75 million, notwithstanding the $300 million term loan debt they had just caused the Company to incur, but projections and internal emails showed that even this increased loan capacity under the ABL Facility would either not be available or would be insufficient given the Company's substantial liquidity needs and cash burn.

105.    Had Defendants observed corporate formalities, the Dividend would have been distributed through the Company's corporate structure—(i) first to Walker Edison Intermediate, (ii) then to Walker Edison Holding, and (iii) then to the beneficial owners of Walker Edison

4864-8601-9280.v1

Holding.  The Dividend, however, was not distributed in accordance with this corporate structure.

Rather, it was paid in cash directly by Walker Edison to Defendants JWC-WE Holdco, Inc. (on

information and belief, an entity owned and/or controlled by Prospect Hill), MB & BB Holdings,

LLC (on information and belief, an entity owned and controlled by Brad Bonham), and Matthew

Davis (collectively, the "**Transfer Recipients**").  The cash amounts of the Dividend transferred to

the Transfer Recipients (the "**Transfers**") are reflected in the below chart and represent 99.4% of

the total Dividend amount above.

| Transfer Recipient | Transfer Amount |
|---|---|
| JWC-WE Holdco, Inc. | $119,895,590.37 |
| MB & BB Holdings, LLC | $66,143,473.13 |
| Matthew Davis | $22,049,157.32 |

106.    In addition to the Transfers to the Transfer Recipients, the Company also distributed

a very minor amount of the Dividend, $1,232,282.60 (representing 0.6% of the Dividend Amount)

for certain senior employee profit interests.  As with the Dividend payouts, the Company did not

receive any of the funds distributed to these employee recipients.

107.    The Transfers were made to and for the benefit of the Transfer Recipients, each of

which were either insiders and controlling owners of Walker Edison or controlled by insiders or

controlling owners of Walker Edison.  Walker Edison received no consideration in return for the

Transfers.

108.    On information and belief, after completion of the Transfers by Walker Edison, the

Transfer Recipients subsequently transferred some or all of the proceeds of the Dividend to

additional persons and entities, including Defendants Brad Bonham, Matt Davis, Walker Edison

Holding Company, LLC, the remaining Defendant Prospect Hill Entities, and certain Doe

defendants who have not yet been identified.

109.    Not only did the Dividend strip the Company of loan proceeds that should have been used to address its liquidity and performance issues, but the $300 million New Secured Loan left the Company with massively increased debt and monthly costs of debt service.  Prior to the consummation of the Loan Agreement and Dividend, the Company had less than $83 million in funded term loan debt and had approximately $22 million outstanding under the ABL Facility that had a borrowing limit of $55 million.  After consummation of the Loan Agreement and the Dividend at the end of March 2021, however, the Company had $300 million in funded term loan debt under the Loan Agreement, with an increased borrowing limit under the ABL Facility of $75 million.  As a result of the closing of the New Secured Loan, the cost of the Company's monthly debt service had therefore more than tripled, from an average of approximately $640,000 per month in the six months prior to the closing of the New Secured Loan to an average of approximately $2 million per month in the six months following the closing of the New Secured Loan.

110.    In other words, the Loan Agreement substantially increased the required cash necessary to fund the Company's debt by more than $1.4 million per month at a time when the Company was already experiencing liquidity and cash problems and an inability to pay debts as they came due in the ordinary course of the Company's activities and affairs.  At the same time, the Dividend depleted the Company of approximately $210 million of cash that could have been used to mitigate the Company's operating losses and fund its debt payments.  All of this was directed and facilitated by Defendants, who used their positions of power over the Company to misrepresent the state of the Company, to the detriment of Blue Owl and the other Lenders.  Had Blue Owl and the other Lenders known the truth about the financial status of the Company, they

would not have supported a transaction that resulted in approximately $210 million departing the Company when those cash proceeds were sorely needed to fund operations and satisfy debt service.

111.    Blue Owl and the other Lenders justifiably relied upon the financial statements and projections prepared and sent by, or at the direction of, Defendants, as well as other materially false and misleading statements and omissions by Defendants alleged herein, made to induce the Lenders to fund the cash necessary to make the Dividend.  In reliance on the Original Actuals and the Financial Projections, which were materially false and misleading, Blue Owl and the other Lenders agreed to enter into the Loan Agreement.

112.    Blue Owl and the other Lenders were misled by Defendants into lending money to a company whose financial health and cash position was worse than Defendants represented—a company that was already considering drastic cuts to spending and jeopardizing its own vendor relationships due to struggles to pay its debts even before it took out a $300 million loan that would not increase its cash position by a single dollar.  As a result of Defendants' fraud and misconduct, Blue Owl and the other Lenders did not have full knowledge of all material facts surrounding the Loan Agreement and the Dividend or the impacts that such transactions would have on the Company and its ability to perform under the Loan Agreement.  In particular, this is because Defendants concealed and misrepresented that the Company's financial statements and projections were materially inflated, false, and inaccurate due to spiraling costs, inventory challenges, and poor cash flow that would render the Company unable to pay its debts.

113.    Blue Owl and the other Lenders were therefore unaware of the Company's financial struggles, which was a material undisclosed fact, and moreover that the $210 million Dividend the Defendants arranged to pay themselves would render the Company insolvent, including leaving it

with inadequate capital, an inability to pay its debts as they became due, and unreasonably small assets in relation to its business. Blue Owl and the other Lenders did not intend to loan $300 million to a Company that was struggling financially, nor did they intend to loan to the Company that would be insolvent at the time of the $210 million Dividend and would soon be unable to pay its vendors. Defendants' fraud prevented Blue Owl and the other Lenders from becoming aware of the true material facts regarding the transaction and the state of the Company so that they could decline to provide the loan that funded the Dividend. Because of the state of circumstances Defendants' fraud created, Blue Owl and the other Lenders did not have knowledge of all material facts and therefore did not ratify, and cannot be deemed to have ratified, the transfer of the $210 million Dividend to Defendants.

V. **AS THE DEFENDANTS FORESAW, WALKER EDISON'S ACTUAL PERFORMANCE DID NOT IMPROVE AFTER CLOSING THE NEW SECURED LOAN AND WALKER EDISON WAS INSOLVENT.**

114.    Contrary to Defendants' fraudulently positive portrayal of the Company's financial health, the Company's gross profit and EBITDA in the period leading up to the closing of the New Secured Loan were materially lower than the projections Defendants had provided to obtain the New Secured Loan. In reality, the Company was facing a severe liquidity shortage and significant increases in expenses (primarily freight, shipping, and distribution center costs) that were not likely to dissipate soon.

115.    Defendants were aware that as of the closing of the New Secured Loan, the Company was inadequately capitalized and would not be able to pay its debts as they came due in the ordinary course of the Company's activities and affairs. This was borne out almost immediately after the closing of the New Secured Loan. Further, the additional debt caused

Walker Edison's debts to be greater than all of its assets.  In other words, as of the closing of the Loan Agreement, the Company was insolvent.

116.    Following the closing of the New Secured Loan on March 31, 2021, the Company missed the projections Defendants had presented to Blue Owl and the other Lenders to justify the New Secured Loan by a material margin.  The Company's actual 2021 net sales of $399.6 million fell more than ***$100 million short*** of its projected forecast of $504.2 million.  And its 2021 actual reported EBITDA of ***negative*** $1.6 million fell well short of its projected $104.4 million.  By the end of 2021, the Company burned through $100 million in cash due substantially to the spiraling costs and inventory challenges that were known prior to the Dividend transaction.

117.    These significant misses reflected the fact that the monthly financials and financial forecasts that Defendants used to justify the Dividend prior to the transaction closing on March 31, 2021 did not reflect the operative reality of the Company due to Defendants' willful and intentional failure to properly allocate freight expenses for accounting purposes, and due to the known persistent increase in freight, shipping, and other costs that the Company experienced in the months preceding and following the issuance of the Dividend.

118.    The Company's actual financial information, which was known to Defendants but intentionally withheld from Blue Owl, showed significant financial and liquidity problems well before the New Secured Loan closed.  Based on this, Defendants should not have caused the Company to take on $300 million in new debt and should have refrained from extracting hundreds of millions of dollars from the Company because such actions immediately jeopardized the Company's ability to continue operations and pay its debts on time.

119.    Had Defendants disclosed the true financial information that was available to them, neither Defendants nor the Company could have rationalized borrowing and paying the Dividend of approximately $210 million solely from borrowed funds.  Nor would Blue Owl and the other Lenders have been willing to provide the New Secured Loan.

## VI.    THE COMPANY ENGAGED IN AN ADDITIONAL EQUITY TRANSACTION.

120.    Just a few months later, Defendants sought and obtained from a New York-based private equity growth firm an additional $250 million equity investment in Walker Edison Holding.  Upon information and belief, Defendants did not disclose material facts regarding their actual expectations that freight and shipping costs would continue to increase in 2021 and to pose solvency and liquidity challenges for the Company, and instead Defendants presented unreasonable and inflated projections to the private equity growth firm in order to induce it to enter into the equity transaction.

121.    As with the New Secured Loan, this May 2021 investment was used to fund a second dividend to Defendants.  Thus, although Defendants personally profited from the deal, barely any of this cash infusion was used to help fund the Company's operations and get it back on its feet.  Ultimately, Walker Edison did not receive any of the proceeds from the May 2021 investment other than the amount necessary to cover the associated transaction costs.  This was a *de minimis* amount compared to the $250 million equity investment and the size of the dividends, and to the cash needed by Walker Edison to solve its continued liquidity and operations problems. Following the additional equity investment, the Company's continuing insolvency only worsened. Ultimately, the private equity growth firm's investment in Walker Edison came to an end a little

more than a year later in a restructuring transaction made necessary by the Company's deepening liquidity problems.

## VII.    WALKER EDISON WAS INSOLVENT WHEN THE COMPANY ISSUED THE DIVIDEND.

122.    As a result of the financial difficulties described above, rational projections of the Company's performance and cash flow based on the information actually known by Defendants would have shown that Walker Edison was insolvent, unable to pay its debts as they came due, and/or would be left with unreasonably small assets at the time of, and as a result of, the Dividend. It was clear internally that the Company would have little cash to help "weather this storm" that it was facing and that the combination of the "erosion in our profit profile" that Defendant Bonham identified and the increase in operating and debt expenses would leave the Company in an untenable financial position.

123.    Defendants, however, refused to correct their materially false and misleading projections to conform to what they knew.  Defendants therefore induced Blue Owl and the other Lenders to enter into the Loan Agreement and Defendants received the Dividend with knowledge that Walker Edison would not be able to pay its debts as they came due in the ordinary course of the Company's activities and affairs, would be left with inadequate capital, and had otherwise unreasonably small assets in relation to its business.

124.    Throughout 2021, based on facts and circumstances that were known to Defendants as of the time of the Company's entry into the Loan Agreement and issuance of the Dividend, Walker Edison experienced a significant cash shortage and failed to pay its vendors on time and in full.  This state of affairs forced the Company to choose which manufacturers would get paid and which ones would have to wait, and which manufacturers would be short paid, including in

situations where this would contravene the Company's legal and contractual obligations. The Company's liquidity worsened as a result of the New Secured Loan, as the Company's debt service requirements increased tremendously, and no proceeds of that loan were made available to the Company for anything other than distribution of the Dividend, repayment of existing debt, or payment of transaction fees. After the closing of the New Secured Loan and the Dividend, the Company was only able to fund operations through the later incurrence of more debt, including additional debt provided by Blue Owl and the other Lenders, as well as new infusions of equity capital, neither of which was reasonably certain nor guaranteed to occur when the Dividend was distributed.

125.    As detailed above, the Company's ability to borrow cash under its ABL Facility was limited. And by March 16, 2021, the Company's internal projections showed that it would exceed its borrowing capacity under its ABL Facility, its key source of liquidity, by April 2021. This was not disclosed to Blue Owl or the other Lenders prior to the closing of the New Secured Loan. Therefore, Defendants knew at the time of the funding of the New Secured Loan and Defendants' receipt of the Dividend that the Company would be left with inadequate capital, total assets less than total liabilities, and otherwise unreasonably small assets and capital, and would be unable to pay its debts as they became due.

126.    Such anticipated problems were borne out as the months passed. As of March 31, 2021, the Company had borrowed approximately $22 million under its $75 million ABL Facility. Less than five months later, in August 2021, the Company increased the availability under its ABL Facility to $100 million. By the end of 2021, the Company had fully drawn the amount available under the ABL Facility, made necessary by the Company's continued failure to meet its

projections, which failure was the inevitable consequence of known facts and circumstances, including rising freight and shipping costs, and inventory challenges known to Defendants before commencing discussions with Blue Owl about the dividend recap.

127.    Even the increase in availability under the ABL Facility was not sufficient to prevent the Company from running out of cash in 2021.  Between September and December 2021, the Company obtained an additional $60 million in cash through capital contributions made by Defendants and other shareholders, who upon information and belief were trying to extend the Company's runway to avoid attention being focused on their prior fraud.  During this period, Defendant Bonham told Defendants Damiano and Casella that "everyone knows ocean freight isn't abating anytime soon."  This confirmed what Defendants knew when they caused the fraudulent Financial Projections to be sent to Blue Owl—that there were severe cost and expense issues drastically impacting the Company's bottom line.  Describing the Company's financial position, Defendant Bonham stated that "the house is on fire," the situation was "precarious," and the Company should fire all Company employees not deemed "mission critical."  In the face of the challenges created by Defendants' extraction of $210 million in badly needed liquidity that might have helped avert these disasters, Defendant Bonham simply told Defendants Damiano and Casella that "***honestly, I want to sail off into the sunset***."

128.    Because Defendants negotiated the Loan Agreement without properly taking account of the Company's negative financial condition and performance at that time, within months of issuing the Dividend, the Company was also in danger of breaching the financial covenants under the Loan Agreement that Defendants caused in order to fund their own massive

4864-8601-9280.v1

$210 million Dividend. Specifically, during the life of the New Secured Loan, the Company was required to maintain a specific "Total Net Leverage Ratio," which was to be tested quarterly.

129.    In fact, by July 2021, less than *four months* after their $210 million Dividend and only two months after their additional equity transaction with a different private equity growth firm, Defendants had informed Blue Owl and the other Lenders that the Company's financial picture was so bleak that it might breach the Total Net Leverage Ratio covenant under the Loan Agreement. Further, on August 27, 2021, less than *five months* after their $210 million Dividend, Defendants notified Walker Edison's lenders that, due to the additional pressures and an influx of pre-bought inventory from Q4 2020, the Company was facing a severe liquidity crisis and likely only had two to four *weeks* of liquidity left. By six months after Defendants' $210 million Dividend, the Company was in fact unable to even satisfy the *very first* Total Net Leverage ratio test on September 30, 2021, a disastrous result that Defendants knew and understood was likely before receiving the Dividend, given the "erosion" of the Company's profit profile and the fact that Defendants didn't "see ocean freight and fedex costs reverting," as Defendant Bonham put it.

130.    The Company's insolvency was known and knowable to Defendants at the time of the Dividend and the New Secured Loan. The failure to satisfy the Total Net Leverage Ratio covenant under the Loan Agreement, if not timely cured, threatened to constitute an "Event of Default" under the Loan Agreement, which would allow the full amount of the New Secured Loan to be accelerated and become immediately due, meaning that the full, approximately $300 million New Secured Loan would have been immediately due and payable, a consequence that would have caused the Company to fall into bankruptcy. The Company did not have sufficient cash or refinancing capability to pay such debt when due. Based on the facts and circumstances known

52

by Defendants but concealed from Blue Owl and the other Lenders when Defendants induced them to enter into the Loan Agreement and fund the New Secured Loan, the Company did not have a realistic chance of satisfying the Total Net Leverage Ratio covenant under the Loan Agreement and was otherwise unable to satisfy its debts as they came due in the ordinary course of business.

## VIII. DEFENDANTS EXECUTE A RESTRUCTURING SUPPORT AGREEMENT AND CHANGE OF CONTROL.

131.    By January 2023, it became clear that because of Defendants' misuse of Walker Edison's financial resources, Walker Edison would not be able to survive without more drastic action.  Unable to fix the problems they had created, Defendants decided to turn over ownership of the Company to Blue Owl and the other Lenders.  Accordingly, Walker Edison, its investors, Blue Owl, and the other Lenders entered into a Restructuring Support Agreement, dated January 27, 2023 (the "**RSA**").

132.    The purpose of the RSA was to (i) preserve and maximize the value of the Company by improving its balance sheet, (ii) provide necessary liquidity to address the Company's operating needs by providing for an additional $13 million loan under the Loan Agreement, (iii) preserve employee jobs, and (iv) satisfy certain of the Company's ongoing obligations.  Pursuant to the transactions attendant to the RSA, the Lenders assumed ownership and control over Walker Edison Intermediate, and, in turn, Walker Edison and its subsidiaries.  The Lenders, including Blue Owl, retained a significant portion of their loans to Walker Edison following the RSA.  The RSA also expressly preserved the Lenders' claims against Defendants.  The RSA would not have been necessary had Defendants acted properly in exercising their fiduciary and managerial duties, and had Defendants not imposed added debt obligations that Defendants knew Walker Edison could not pay.

133.    By early 2023, Defendants' wasteful and unnecessary looting of Walker Edison, a once-successful Utah-based global furniture business, had jeopardized the long-term survival of the Company.   Defendants, in the face of this disastrous result and having improperly caused a massive liquidity event at the worst possible time simply to line their own pockets, exited the Company hundreds of millions of dollars richer and left Blue Owl and the other Lenders to pick up the pieces and rebuild.

134.    Following the RSA, in 2023, Blue Owl and the other Lenders have been forced to extend an additional $66.5 million in loans to the Company to fund ongoing operations, in addition to their pre-existing loans.   Therefore, as of the date of this Amended Complaint, the Company has issued at least $366.5 million of debt to Blue Owl and the other Lenders.

135.    Until the transfer of ownership in early 2023, Defendants were able to conceal the full extent of their fraud and the existence of Walker Edison's solvency from Blue Owl and the other Lenders.   Once Defendants relinquished control over Walker Edison and access to its books and records and employees, their wrongdoing became apparent.

136.    On July 24, 2023, Blue Owl (as administrative agent and on behalf of the Lenders) and Defendants entered into a tolling agreement, whereby the parties agreed that the statute of limitations for any claims brought by Blue Owl or the other Lenders shall be tolled and extended through dates subsequent to the date of the original and amended Complaints.

## CAUSES OF ACTION

**COUNT I:  Constructive Fraudulent Transfer Under Utah Code §§ 25-6-202, 203, 304, And Other Equivalent State Laws**
*(Against Defendants Brad Bonham, Matthew Davis, MB & BB Holdings, LLC, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100)*

137.    Blue Owl restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

138.    Blue Owl, on its own behalf and on behalf of the Lenders, was a creditor of Walker Edison before the Transfers were distributed to the Transfer Recipients.

139.    Blue Owl and the other Lenders have been, and remain, creditors of Walker Edison at all subsequent times and are current creditors of Walker Edison.

140.    On or around March 31, 2021, following the closing of the New Secured Loan, Walker Edison made the Transfers to the Transfer Recipients (JWC-WE Holdco, Inc., MB & BB Holdings, LLC, and Davis).  On information and belief, Walker Edison Holding also received a legal right to some or all of the Transfers pursuant to its operating agreement or other governance documents and therefore can be considered a recipient of the Transfers.

141.    On information and belief, after completion of the Transfers by Walker Edison, the Transfer Recipients subsequently transferred some or all of the proceeds of the Dividend (collectively, the "**Uptier Transfers**") to persons or entities, including Brad Bonham, Matt Davis, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and certain Doe defendants who have not yet been identified (collectively, the "**Uptier Transfer Defendants**").

142.    On information and belief, Walker Edison did not receive reasonably equivalent value for the Transfers.

143.    At the time of and after completion of the Transfers, Walker Edison was unable to pay its debts as they came due in the ordinary course of Walker Edison's activities and affairs, including payments to manufacturers and suppliers and its obligations under the Loan Agreement. To continue operations in 2021, the Company required an additional $60 million in equity contributions and an additional $20 million in availability under the ABL Facility.

144.    At the time of and after the Transfers, Walker Edison's financial statements showed that its total assets were less than the sum of its total liabilities.

145.    At the time of and after the Transfers, Walker Edison was engaged, or was about to be engaged, in a business or a transaction for which its remaining assets were unreasonably small in relation to their business or transaction.

146.    At the time of and after the Transfers, Walker Edison intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they came due.

147.    Walker Edison was insolvent at the time of the Transfers, and became insolvent as a result of the Transfers, which were eventually distributed by the Transfer Recipients to the Uptier Transfer Defendants via the Uptier Transfers.

148.    The Transfer Recipients and any immediate or mediate transferee of the Transfer Recipients, including but not limited to the Uptier Transfer Defendants, did not receive any interests or proceeds of the Transfers in good faith or for value.

149.     The Transfers and the Uptier Transfers are avoidable as constructive fraudulent transfers under both Utah Code §§ 25-6-202 and 203.  Under Utah Code § 25-6-304, Blue Owl is entitled to a judgment against the Transfer Recipients and the Uptier Transfer Defendants for the lesser of the value of the Transfers or the amount necessary to satisfy Blue Owl's and the other Lenders' claims, both those incurred before and after the Transfers, together with prejudgment interest from the date of such transfers, costs, all other relief set forth in Utah Code § 25-6-303 (including avoidance of the full value of the Transfers), or compensatory damages in an amount to be determined for the value thereof, and any further relief that this Court deems just, fair, and equitable.

### COUNT II:  Actual Fraudulent Transfer Under Utah Code § 25-6-202 And Other Equivalent State Laws
### (Against Defendants Brad Bonham, Matthew Davis, MB & BB Holdings, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100)

150.     Blue Owl restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

151.     Blue Owl, on its own behalf and on behalf of the other Lenders, was a creditor of Walker Edison before the Transfers were distributed to the Transfer Recipients.

152.     Blue Owl and the other Lenders have been, and remain, creditors of Walker Edison at all subsequent times and are current creditors of Walker Edison.

153.     On information and belief, after completion of the Transfers by Walker Edison, the Transfer Recipients subsequently made the Uptier Transfers to the Uptier Transfer Defendants.

154.    The Transfer Recipients and any immediate or mediate transferee of the Transfer Recipients, including but not limited to the Uptier Transfer Defendants, did not receive any interests or proceeds of the Transfers in good faith or for value.

155.    The Transfers were made with an actual intent to hinder, delay, and/or defraud creditors of Walker Edison to the detriment and harm of its creditors, including Blue Owl and the other Lenders.  Such intent can be inferred from several badges of fraud, as set forth in Utah Code § 25-6-202(1)(a), including, among other things, on information and belief:  (i) the Transfers were made to and for the benefit of Defendants or their related entities, each of which was an insider of the applicable debtor; (ii) the Transfers were in effect transfers of substantially all of Walker Edison's assets in light of the Company's severe liquidity constraints and operational pressures; (iii) the value of the consideration received by Walker Edison was not reasonably equivalent to the value of the Transfers; (iv) Walker Edison was insolvent or became insolvent as a result of the Transfers that were made; and (v) the Transfers occurred shortly after a substantial debt was incurred in the form of the obligation under the Loan Agreement.

156.    The Transfers and the Uptier Transfers are avoidable as actual fraudulent transfers under both Utah Code §§ 25-6-202 and 203.  Under Utah Code § 25-6-304, Blue Owl is entitled to a judgment against the Transfer Recipients and the Uptier Transfer Defendants for the lesser of the value of the Transfers or the amount necessary to satisfy Blue Owl's and the other Lenders' claims, both those incurred before and after the Transfers, together with prejudgment interest from the date of such transfers, costs, all other relief set forth in Utah Code § 25-6-303 (including avoidance of the full value of the Transfers), or compensatory damages in an amount to be

determined for the value thereof, and any further relief that this Court deems just, fair, and equitable.

## COUNT III:  Civil Conspiracy
### (*Against All Defendants*)

157.    Blue Owl restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

158.    Defendants and their representatives formed a combination of two or more persons.

159.    Defendants each sought to accomplish the object of committing fraud in order to cause Blue Owl to provide the New Secured Loan, which would enable Defendants to cause Walker Edison pay out the Dividend for their own benefit and for the benefit of their affiliates and assigns.

160.    Defendants had a meeting of the minds to accomplish their object by providing and causing to be provided materially false, misleading, and fraudulent financial projections, statements, and omissions that would induce Blue Owl to invest in the Company in order to finance the New Secured Loan.

161.    As alleged herein, Defendants conspired and participated in the commission of one or more unlawful, overt acts in furtherance of their object, as alleged herein, including but not limited to making and causing to be made fraudulent and false statements to Blue Owl and its representatives during the course of the diligence leading up to the Loan Agreement; distributing erroneous and fraudulent financial reports and projections to Blue Owl and its representatives; failing to notify Blue Owl of the materially false and fraudulent financial reports and projections; omitting material information regarding the rising freight and shipping costs, declining margin, and declining EBITDA that made the financial reports and forecasts materially false and

fraudulent; and causing the Company to enter into the Loan Agreement and distribute the Dividend to the Transfer Recipients.

162.    Blue Owl has suffered damages as a direct result of these actions.  As a result, Blue Owl is entitled to a judgment of liability against the Defendants for civil conspiracy.

### COUNT IV:  Fraud
### (*Against All Defendants*)

163.    Blue Owl restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

164.    As alleged herein, Defendants prepared and caused to be prepared the Original Actuals and the Financial Projections, both of which contained material misstatements and omissions, and caused them to be provided to Blue Owl and the Lenders.  Defendants knew that the Original Actuals and Financial Projections were materially false, misleading, and incorrect when they were sent to Blue Owl, and at no point before the closing of the New Secured Loan did they attempt to notify Blue Owl or the other Lenders of any errors or omissions.  Further, Defendant Casella, acting on behalf of all the Defendants and with their prior authorization and knowledge, transmitted those documents to Blue Owl.

165.    Defendants made, and caused to be made, material misrepresentations in oral and written communications with Blue Owl during the course of Blue Owl's diligence, as alleged herein.  In addition, Defendants made, caused, and authorized material misrepresentations and omissions to Blue Owl during the course of its diligence and in the Loan Agreement, as alleged herein.  At no point did Defendants attempt to notify Blue Owl or the other Lenders of any errors or omissions.

166.     Defendants made, caused to be made, authorized, ratified, and approved materially false and misleading representations and omissions in the Loan Agreement on March 31, 2021, including but not limited to the representations in sections 3.04(a) (Financial Statements), 3.04(b) (Absence of a Material Adverse Effect), 3.13(a) (No Material Misstatements), 3.13(b) (Projections), and 3.15 (Solvency) of the Loan Agreement.     Defendants knew these representations, and the other representations alleged herein, were materially false and misleading or contained material omissions when they caused and authorized the Loan Agreement to be executed on Walker Edison's behalf.     In addition to being directly liable for fraud based on Defendants' knowingly causing to be made, and making, material misrepresentations and omissions, Defendants as principals are vicariously liable for the actions and imputed knowledge of their authorized agents, including but not limited to Walker Edison, Walker Edison Intermediate, and members of Walker Edison's management acting within the course and scope of their authority in transmitting those material misrepresentations and omissions to Blue Owl at Defendants' direction and for Defendants' benefit, as alleged herein.

167.     As alleged herein, Defendants authorized and ratified an Omnibus Officer's Certificate and an Omnibus Written Consent on behalf of Defendant Walker Edison Holding Co. LLC dated March 31, 2021 that authorized Walker Edison to enter into the Loan Agreement and authorized the acts undertaken by their agents in connection with the Loan Agreement, thereby causing, approving, and adopting all of the material false statements contained within the Loan Agreement and in the diligence leading up to the execution of the Loan Agreement.     The Omnibus Written Consent also falsely represented that Walker Edison would not be rendered insolvent, lack adequate capital, be unable to pay its debts, or have assets with a saleable value less than its

liabilities as a result of the Loan Agreement, materially false representations that were a material inducement to Blue Owl and the other Lenders to enter into the Loan Agreement. For all the reasons alleged herein, these representations were knowingly false when made. The Board (which includes Defendants) oversaw and controlled Defendant Walker Edison Holding Company LLC, and the Board Defendants authorized the Loan Agreement, and caused Walker Edison, its affiliates, and its employees and agents to execute the Loan Agreement, and are therefore liable for the material misrepresentations and omissions made to Blue Owl and the other Lenders in the Loan Agreement and during the loan diligence process, which they knowingly caused, approved, authorized, and ratified.

168.    Defendants made these misrepresentations and caused the misrepresentations to be prepared and made to Blue Owl and the Lenders. Defendants did so with the intent to fraudulently induce Blue Owl and the Lenders to enter into the Loan Agreement, thereby allowing Defendants to extract hundreds of millions of dollars from Blue Owl and the Lenders to enrich themselves.

169.    Defendants knew these material misrepresentations and omissions were false. Defendants also made, and caused these statements to be made recklessly, knowing that there was insufficient basis for these representations.

170.    These misrepresentations and omissions were made for the purpose of inducing Blue Owl and the other Lenders to enter into the Loan Agreement and provide $300 million in New Secured Loan, approximately $210 million of which was paid as a Dividend to line Defendants' pocketbooks.

171.    When these misrepresentations and omissions were made, Blue Owl and the other Lenders were not aware of their falsity. These fraudulent misrepresentations and omissions

concealed the truth about Walker Edison and prevented Blue Owl and the other Lenders from being able to determine the true state of Walker Edison's financials and future business outlook.

172.    Blue Owl and the other Lenders did, in fact, reasonably rely upon these materially false, misleading, and fraudulent statements and omissions by, among other things, entering into the Loan Agreement and funding the New Secured Loan, which allowed Defendants to extract the Dividend from Walker Edison.

173.    As a direct and proximate result of Defendants' fraudulent statements, Blue Owl and the other Lenders have been damaged by, among other things, providing $300 million to Walker Edison under the Loan Agreement that Defendants subsequently used to pay themselves the Dividend.  Had Blue Owl and the other Lenders known the true material facts that were concealed and misrepresented by Defendants and their agents, they would not have entered into the Loan Agreement.

174.    Blue Owl and the other Lenders have suffered at least $300 million in damages as a result of Defendants' fraud.  Blue Owl is entitled to:  (1) damages and restitution of the amounts that Defendants extracted from Blue Owl and the other Lenders as a result of Defendants' fraudulent statements; (2) disgorgement of all ill-gotten gains to the Controlling Defendants as a result of their fraudulent conduct; and (3) punitive damages by reason of the fraudulent, wanton, willful, reckless, and malicious acts of the Controlling Defendants.

### COUNT V:  Aiding And Abetting Fraud
### (*Against All Defendants*)

175.    Blue Owl restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

176.    Each Defendant aided and abetted the wrongful conduct perpetrated against Blue Owl and the other Lenders by every other Defendant.

177.    As alleged herein, every Defendant thereby aided and abetted the fraudulent conduct described above, including that each Defendant counseled, induced, commanded, assisted, aided, abetted, and provided substantial assistance to every other Defendant in:  (1) preparing and causing to be prepared the Original Actuals and the Financial Projections that contained material misstatements and omissions that they knew would be provided by Blue Owl and the Lenders to induce them to enter into the loan transaction; (2) making and causing to be made material misrepresentations in oral and written communications with Blue Owl during the course of Blue Owl's diligence; (3) making, causing to be made, authorizing, ratifying, and approving material misrepresentations and omissions to Blue Owl and the other Lenders in the Loan Agreement; and (4) authorizing and ratifying an Omnibus Officer's Certificate and Omnibus Written Consent dated March 31, 2021 that authorized Walker Edison to enter into the Loan Agreement, approved and adopted all of the false statements contained within the Loan Agreement and elsewhere, and falsely represented that the Company would not be rendered insolvent as a result of the transactions contemplated by the Loan Agreement.

178.    Each and every Defendant knowingly counseled, induced, commanded, assisted, aided, abetted, and provided substantial assistance and encouragement to the other Defendants to commit fraud, and each and every Defendant knew the true facts regarding the fraudulent statements, materially false or misleading statements, and statements containing material omissions and acted intentionally to induce Blue Owl and the other Lenders to enter into the Loan Agreement.  Defendants nonetheless kept their knowledge of these problems concealed from Blue

Owl and other Lenders and thereby aided and abetted the fraud perpetrated against Blue Owl and the other Lenders.

179.    As a result of Defendants' bad acts, Defendants are jointly responsible for the damages to Blue Owl and the other Lenders resulting from the fraud.

## COUNT VI:  Unjust Enrichment
### (*Against All Defendants*)

180.    Blue Owl restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

181.    This unjust enrichment claim is asserted in the alternative, in the event the remedies asserted in the preceding claims do not provide an adequate remedy at law.

182.    Defendants received benefits when they wrongfully received the Transfers and/or the Uptier Transfers.

183.    Defendants knowingly and voluntarily accepted and retained benefits in the form of the Transfers and/or the Uptier Transfers.

184.    The circumstances alleged in this Complaint render Defendants' retention of those benefits unjust and inequitable.

185.    Defendants have been unjustly enriched at the expense of Blue Owl in the amount of the Transfers and/or the Uptier Transfers, and Blue Owl is entitled to judgment in those amounts.

186.    Blue Owl is entitled to the return of the Transfers and/or the Uptier Transfers through disgorgement or any other applicable remedy and judgment against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Blue Owl respectfully requests the Court enter judgment as follows:

a.      On its first Cause of Action, for judgment in favor of Blue Owl and against Defendants Brad Bonham, Matthew Davis, MB & BB Holdings, LLC, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100:

i.      Pursuant to Utah Code § 25-6-303(1)(a), to avoid and recover all fraudulent transfers until all funds, assets, and property are recovered by Blue Owl and the other Lenders;

ii.      Pursuant to Utah Code § 25-6-303(1)(c)(ii), appointing a receiver; and

iii.      Granting the remedies provided for avoidance and recovery under Utah Code § 25-6-303(1):

(a)      avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claims;

(b)      avoidance of the full value of the transfer or obligation as the circumstances may require;

(c)      an attachment or other provisional remedy against the asset transferred or other property of the transferee if available under applicable law; and

(d)      subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

(i)      an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(ii)      appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

        (iii)     any other relief the circumstances may require;

    b.     On its second Cause of Action, for judgment in favor of Blue Owl and against Defendants Brad Bonham, Matthew Davis, MB & BB Holdings, LLC, Walker Edison Holding Company, LLC, Prospect Hill Growth Partners, L.P., JWC-WE Holdco, LLC, JWC-WE Holdings, L.P., Prospect Hill Growth Fund II, L.P., Prospect Hill Growth Fund II Co-Invest, L.P., and Does 1-100:

        i.     Pursuant to Utah Code § 25-6-303(1)(a), to avoid and recover all fraudulent transfers until all funds, assets, and property are recovered by Blue Owl and the other Lenders;

        ii.     Pursuant to Utah Code § 25-6-303(1)(c)(ii), appointing a receiver; and

        iii.     Granting the remedies provided for avoidance and recovery under Utah Code § 25-6-303(1):

        (a)     avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claims;

        (b)     avoidance of the full value of the transfer or obligation as the circumstances may require;

        (c)     an attachment or other provisional remedy against the asset transferred or other property of the transferee if available under applicable law; and

        (d)     subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

        (i)     an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

       (ii)     appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

       (iii)     any other relief the circumstances may require;

c.     On its third Cause of Action, for judgment in favor of Blue Owl and against Defendants, awarding Blue Owl and the other Lenders damages sustained as a result of the civil conspiracy and an amount of punitive damages, together with attorneys' fees and prejudgment interest, in an amount to be decided at trial;

d.     On its fourth and fifth Cause of Actions, for judgment in favor of Blue Owl and against Defendants, awarding Blue Owl and the other Lenders damages sustained as a result of fraud and an amount of punitive damages, together with attorneys' fees and prejudgment interest, in an amount to be decided at trial;

e.     On its sixth Cause of Action, for judgment in favor of Blue Owl and against Defendants, awarding disgorgement and Blue Owl and the other Lenders damages for such unjust enrichment, together with prejudgment interest, in an amount to be decided at trial; and

f.     On all Causes of Action, for:

    i.     Restitution;

    ii.     Disgorgement of the Transfers and/or the Uptier Transfers;

    iii.     Preliminary and permanent injunctive relief;

    iv.     Attorneys' fees and costs;

    v.     Prejudgment interest; and

    vi.     Other further relief as is just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Blue Owl hereby demands a jury trial of all issues in this action triable of right by a jury.

DATED July 12, 2024.

**PARSONS BEHLE & LATIMER**
*/s/ Erik A. Christiansen*
_____
Erik A. Christiansen

Attorneys for Blue Owl Capital Corporation

## CERTIFICATE OF SERVICE

I certify that on this 12th day of July, 2024, a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** was filed electronically through the court's electronic filing system, which caused all counsel appearing in the case to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Sarah Jenkins Dewey*

4864-8601-9280.v1